Louise TODARO, Ernestine Davis, Deidra Plair, Phyllis Klippel, Sylvia Davis, Cleo Bacon, Iris Capella, Naomi Bostick, Mary Reed, Alice Taver, Carol Lewin, Tammy Goldston, Margaret Gatling, Tonya Jackson, Tracye Craig, Beverly Massey, Carmen Garcia, Helen LaVore, Gloria Taggart, Marta Hardee, Althea McDaniel, Ruth Dobson, Madeline Pineda, Judy Wheat, Bernadette Brown, and Evelyn Thorpe, on behalf of themselves and all other persons similarly situated, Plaintiffs-Appellees,

v.

Benjamin WARD, Commissioner of the New York State Department of Correctional Services, Ian Loudon, Assistant Commissioner for Health Services of the New York State Department of Correctional Services, David Frost, Southern Regional Director of Health Services of the New York State Department of Correctional Services, Frances Clement, Superintendent of Bedford Hills Correctional Facility, Henry Williams, Health Services Director of Bedford Hills Correctional Facility, Robert Tschorn, Surgical Consultant at Bedford Hills Correctional Facility, and Marie Daly, Nurse Administrator at Bedford Hills Correctional Facility, Individually and in their official capacities, Defendants-Appellants.

No. 337, Docket 77–2095.

United States Court of Appeals,
Second Circuit.

Argued Oct. 6, 1977.
Decided Oct. 31, 1977.

Arlene R. Silverman, Asst. Atty. Gen. of the State of New York, New York City (Louis J. Lefkowitz, Atty. Gen. of the State of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen. of the State of New York, New York City), for defendants-appellants.

Eric Neisser, New York City (William E. Hellerstein, Ellen J. Winner, The Legal Aid Society Prisoners' Rights Project, New York City), for plaintiffs-appellees.

Before KAUFMAN, Chief Judge, GURFEIN and MESKILL, Circuit Judges.

KAUFMAN, Chief Judge:

The sad—often desperate—plight of many incarcerated in our nation's prisons is most dramatically revealed by the all too frequent petitions of inmates who have been denied access to basic medical services.

It is too late in the day to argue that penal incarceration reduces an individual's humanity. Although the public may only become aware of the demeaning reality of prison life when frustrations explode into riot, it is important to accord the basic amenities of human existence to those whom we expect one day will assume a productive role in society. The evolving standards of decency embodied by the Eighth Amendment have been refined in response to these vital needs, and courts have critically scrutinized alleged deprivations suffered by the incarcerated beyond those inherent in the very structure of prison life. When inhuman or barbaric conditions are discovered, judges will not hesitate to enter the breach and order remedial measures.

In the instant case we are called upon to decide, as have other courts in recent years, whether several important aspects of a correctional institution's overall health care system meet constitutional requirements. We agree with the able district judge that they do not. While the physician staff and physical facilities at the Bedford Hills Correctional Facility may be adequate, all too often an inmate in need of treatment has been denied access to medical help by arbitrary procedures and misadministration so gross that it must be deemed willful. Faced with this deliberate denial of basic health care, we have little difficulty affirming the moderate remedial measures ordered by the district court.

I.

The facts are set out in great detail in the district judge's thorough opinion.[1] Accordingly, we need review them only briefly.

Bedford Hills is a medium security facility confining the approximately 380 female prisoners committed to the custody of the New York Department of Corrections. At the time of trial in January and February 1976, the medical staff at Bedford Hills consisted of one full-time physician, the prison's Health Services Director, Dr. Henry D. Williams, one part-time gynecologist, and four outside consultants who, in combination, practiced general medicine at the prison clinic three hours a day, six days a week. In addition, dermatology, neurology, podiatry, and optometry clinics were held on an irregular basis several times a year. Hospital services were provided by community facilities near the prison.

The existence of this structure for the administration of health care was of little avail to many prisoners for, as Judge Ward noted, certain procedures employed by the appellants significantly impeded inmate access to medical services at Bedford Hills and caused doctor-prescribed treatments and tests not to be administered promptly. As a result, essential medical services were denied, or unreasonably delayed and inmates forced to suffer needless pain. For the sake of clarity we will briefly outline the prison's major deficiencies.

1. *The Lobby Clinic*

Of the many hurdles confronting an inmate seeking adequate medical care, the first, almost insuperable, obstacle stood at the point of intake, in the operation of the "lobby clinic," a screening device which inmates must use to secure an appointment with a physician. During the clinic's one-hour sessions, held twice daily in one of the prison's residence halls, a single nurse both listened to requests for care and dispensed medication. Since she was locked in a small room to prevent the theft of drugs, the nurse's contact with the many inmates seeking help was minimal, no more than a cursory glance from inside a locked and barred cashier's window. This procedure, of course, precluded any opportunity for a physical examination to determine the na-

1. 431 F.Supp. 1129 (S.D.N.Y.1977).

ture and extent of the patient's ailment. Moreover, the trial court estimated that the nurse spent an average of only 15 to 20 seconds with each prisoner. During that brief span—hardly time for the inmate to even describe her ailment—the nurse made cryptic notes of complaints (e. g., "throat," "stomach"), which were later transmitted to another nurse who, on the basis of this scanty record, assigned priorities in scheduling appointments with doctors.

Appellees' experts testified that these screening procedures, the gateway to all medical services at Bedford Hills, did not even approach the barest minimum standard of effectiveness. Yet neither Dr. David Frost, the regional Director of Health Services for the Department of Corrections, nor Dr. Williams were sufficiently concerned about its efficacy to observe the clinic in operation.

The effects of the screening procedure were, on occasion, devastating. Analysis of the medical records in evidence and the testimony of five inmate witnesses revealed that delays of two weeks to two months in achieving access to a physician were not uncommon. Judge Ward cited five specific instances in which women inmates had been forced to endure unnecessary pain as a result of delay, including the case of one, with a recent history of permanent eye damage from a parasitic infection, who waited two weeks before a doctor attended to her complaint of impaired vision.

To correct these glaring instances of maladministration, the district court directed state officials either to place a physician in the lobby clinic, a common practice in other correctional institutions, or, to substantially improve the screening procedure.[2]

### 2. Sick Wing

The sick wing, consisting of nineteen rooms, is used to house women suffering from severe fevers, elevated blood pressure and epilepsy, or whose maladies are sufficiently dangerous to warrant bed rest and observation. But, as the testimony of appellees' experts made clear, the operation of the sick wing was substandard and, to describe its faults modestly, was marked by a serious lack of communication and medical observation. In the sick wing, patients were often placed in locked rooms, denied even the opportunity to make verbal requests for assistance. Moreover, the closest officer was inconveniently located in a station across a lobby from the sick wing corridor. And, to make matters worse, even this inadequate access could be blocked, at the officer's discretion, by closing a solid door which prevented observation of the rooms and made it impossible to hear the inmates' cries for aid. Even if such a plea for emergency help were answered, adequate medical assistance might be delayed since the medical staff and supplies were located in the ambulatory care clinic on the other side of another solid, continuously-locked door. These inadequacies but reflected others, equally severe. Medical equipment or emergency supplies were not to be had either on the sick wing corridors or in the officer's station closest to the infirmary. And, nights often passed without even a single nurse on duty.

The court cited two instances in which inadequate provision for communication and observation in the sick wing seriously endangered the health of inmates. The judge cogently commented that he "need not wait until an epileptic chokes to death on her tongue," in the absence of proof that such a catastrophe had actually occurred. He held correctly, we believe, that these deficiencies subjected inmates to grave and unnecessary risks. Accordingly, the judge ordered that the wooden door be removed and that a nurse be stationed in a position to observe the sick wing between the hours

---

**2.** Other improvements mandated by Judge Ward included requirements that the lobby clinic nurse, after adequate training in "triage", or screening techniques, make adequate physi-cal examinations, have each inmate's medical record available, set a definite doctor's appointment to be held within two weeks of the complaint, and keep detailed records.

of 4 p. m. to 8 a. m. The judge also appropriately directed that a nurse make rounds every two hours at night, that appellants install a nurse buzzer call system and that inmate-patients be locked in their rooms only under extraordinary circumstances and then only if observed at regular ½ hour intervals by a nurse.

### 3. Follow-Up Procedures

Even those inmates who found a doctor at the end of Bedford's medical labyrinth were still not free of the system's misadministration. Poor recordkeeping and inadequate notice procedures caused substantial delays, in some cases extending several months, in scheduling doctor-ordered follow-up appointments and diagnostic tests. During the period October 1974 to July 1975 nearly half of all follow-up appointments were not scheduled within five days after the date set by the physician. And repeated noncompliance with medical orders resulted in failures properly to treat illnesses.

To cure these inadequacies the judgment below decreed strict procedures for correcting the inadequate medical administration at Bedford.

### II.

■ The Supreme Court recently approved the longstanding rule of this circuit when it declared that "deliberate indifference to serious medical needs of prisoners [violates] the Eighth Amendment." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). Noting that inmates are utterly dependent upon their custodians, the Court was careful to observe that the Eighth Amendment forbids not only deprivations of medical care that produce physical torture and lingering death, but also less serious denials which cause or

perpetuate pain. To assert otherwise would be inconsistent with contemporary standards of human decency. It is clear from this principle that a constitutional claim is stated when prison officials intentionally deny access to medical care or interfere with prescribed treatment. *See Estelle v. Gamble, supra,* 429 U.S. at 104–05, 97 S.Ct. 285; *Martinez v. Mancusi,* 443 F.2d 921 (2d Cir. 1970), *cert. denied,* 401 U.S. 983, 91 S.Ct. 1202, 28 L.Ed.2d 335 (1971); *Corby v. Conboy,* 457 F.2d 251 (2d Cir. 1972).

■ We have often allowed the recovery of damages when an individual has received improper medical care; *a fortiori* the Constitution does not stand in the way of a broader attack on the adequacy of an institute's entire health care system which threatens the well-being of many individuals. And while a single instance of medical care denied or delayed, viewed in isolation, may appear to be the product of mere negligence, repeated examples of such treatment bespeak a deliberate indifference by prison authorities to the agony engendered by haphazard and ill-conceived procedures. Indeed, it is well-settled in this circuit that "a series of incidents closely related in time . . . may disclose a pattern of conduct amounting to deliberate indifference to the medical needs of prisoners." *Bishop v. Stoneman,* 508 F.2d 1224 (2d Cir. 1974). *See Newman v. Alabama,* 503 F.2d 1320 (5th Cir. 1974), *cert. denied,* 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed. 102 (1975). When systematic deficiencies in staffing, facilities or procedures make unnecessary suffering inevitable, a court will not hesitate to use its injunctive powers. *See Bishop v. Stoneman, supra; Newman v. Alabama, supra,* 503 F.2d at 1328–30. *See also Cruz v. Ward,* 558 F.2d 658, 662 (2d Cir. 1977).[3]

■ The record leaves no doubt that the medical practices and procedures at Bed-

---

**3.** Prison health care has often been challenged in other courts on an institutional level basis. *See Finney v. Arkansas Board of Correction,* 505 F.2d 194 (8th Cir. 1974); *Gates v. Collier,* 501 F.2d 1291 (5th Cir. 1974); *Miller v. Carson,* 401 F.Supp. 835 (M.D.Fla.1975); *Jones v. Wittenberg,* 330 F.Supp. 707 (N.D.Ohio 1971), *aff'd sub nom. Jones v. Metzger,* 456 F.2d 854 (6th Cir. 1972).

ford Hills were constitutionally infirm. Each of Judge Ward's factual conclusions are based upon persuasive expert testimony and concrete examples drawn from inmate medical records. They conclusively demonstrate that existing procedures have resulted in interminable delays and outright denials of medical care to suffering inmates. Moreover, despite appellants' protestations that the findings of constitutional violations are based upon only a "handful" of individual cases, we find it both remarkable and unsettling that the court was able to cite so many instances of delayed or denied treatment among the 64 inmate records introduced into evidence by the appellees. The district court reasonably concluded that the records produced by the appellees were representative of the medical treatment provided to the class as a whole.[4]

In addition, the trial judge's painstaking opinion leaves little doubt that he not only recognized the proper legal standards but also applied them correctly in sifting through the voluminous evidence. Indeed, Judge Ward rejected many of the appellees' claims of inadequate medical care, drawing careful distinctions between those practices which, while perhaps undesirable, do not amount to constitutional infractions, and those that do.[5] And, in each instance in which a constitutional violation was found—the procedures devised to screen inmates' requests for medical assistance, to follow-up doctors' orders, and to observe patients confined to sick wing—the appellees demonstrated through expert testimo-

ny that the methods employed failed to meet even minimal standards. Moreover, the testimony of the appellants' own witnesses revealed that they were either fully aware of these infirmities or, in the case of the lobby clinic, unjustifiably neglected to learn whether the condition complained of existed. Any attempts to correct these obvious and glaring flaws had been flimsy at best.[6]

■■ The appellants also claim that the procedures utilized at Bedford Hills were no worse than those in force at other correctional facilities. But this court has repeatedly rejected the argument that institutional practices must be defective in the maximum degree before a violation of constitutional rights can be found and corrected. *Detainees of Brooklyn House of Detention v. Malcolm*, 520 F.2d 392, 399 (2d Cir. 1975); *Rhem v. Malcolm*, 507 F.2d 333, 337 (2d Cir. 1974). To hold otherwise would encourage a levelling of prison health standards to the "lowest common denominator," a course we cannot condone.

### III.

■■ While federal courts have traditionally adopted a broad hands-off attitude toward the daily problems of prison administration, "a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution." *Procunier v. Martinez*, 416 U.S. 396, 405, 94

4. In response to the argument that this sample provided an insufficient basis upon which to draw accurate statistical conclusions, we can only reply that the records were not preselected by appellees' attorneys, and their limited number is directly attributable to constraints prescribed by the court's discovery order issued in response to the state's resistance to broader discovery. If the records introduced were atypical, the appellants were free to introduce others. This they failed to do.

5. The district court found the physician staff at Bedford Hills adequate. In addition, the court determined that the appellees had failed to prove deficiencies rising to constitutional dimensions in the (1) delayed administration of

health examinations upon admission to the institution; (2) delayed reporting of diagnostic test results; (3) treatment of the chronically ill; (4) assignment of medically unapproved work duties; and (5) access to outside specialists and elective surgery.

6. The appellants assert that the individual instances of medical care denied or delayed involved relatively minor medical problems. They attempt to trivialize delays of weeks and months in the treatment of glaucoma, chest pains, vaginal blood clots, liver disease, eye infections, hypertension and countless other serious ailments. We must disagree.

S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). Furthermore, we believe the policy of deference to state officials is less substantial when, as in the present case, matters of prison discipline and security are not at issue. *See Newman v. Alabama, supra,* 503 F.2d at 1329–30 (5th Cir. 1974). We are certainly not pleased to envision the district court assuming a permanent role in the administration of medical care at Bedford Hills. But we are equally reluctant to countenance an abdication of responsibility in correcting defects in the health care system which deprives appellees of their right to constitutionally adequate medical care.[7]

Finally, we are convinced that instituting the narrow reforms mandated by the judgment of the district court will not be unduly burdensome or costly.[8]

The fully supported judgment of the district court will be affirmed in all respects.

---

7. Appellate tribunals have accorded district courts broad discretion to frame equitable remedies so long as the relief granted is commensurate with the scope of the constitutional infraction. *Milliken v. Bradley,* —— U.S. ——, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977); *Rhem v. Malcolm, supra,* 507 F.2d at 340–41; *Newman v. Alabama, supra,* 503 F.2d at 1332–33. Judge Ward's specific and limited relief is carefully tailored to cure the infirmities at Bedford Hills which offend the constitution, and no

more. The decree minimizes the need for further judicial intervention in prison affairs.

8. Inadequate resources no longer can excuse the denial of constitutional rights. *See Detainees of Brooklyn House of Detention v. Malcolm, supra,* 520 F.2d at 399; *Rhem v. Malcolm, supra,* 507 F.2d at 341 n.20. *Cf. Milliken v. Bradley , supra,* —— U.S. at ——, 97 S.Ct. at 2761–62.