**Paul JOHNSON, Petitioner,**

v.

**David R. HARRIS, Warden, Green Haven Penitentiary, Respondent.**

**No. 79 Civ. 4573.**

United States District Court,
S. D. New York.

Oct. 9, 1979.

---

Robert W. Farrell, Mineola, N. Y., for petitioner.

Robert Abrams, Atty. Gen., New York City, for respondent; Burton Herman, Asst. Atty. Gen., New York City, of counsel.

## OPINION

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

This is an action brought pursuant to 42 U.S.C., section 1983 [1] and under the Eighth Amendment to the United States Constitution.[2] The plaintiff, who was sentenced in 1965 to a term of from twenty years to life imprisonment, following his conviction for murder in the first degree, is currently incarcerated at Green Haven Penitentiary, a state facility in Stormville, New York. The core of his challenge, however inartfully phrased, is that he is being denied necessary medical and dietetic care while incarcerated, and that as a consequence, he has been forced to endure cruel and unusual punishment.

After a hearing, it is apparent that the facts of the case are not seriously disputed. The plaintiff is a "brittle" diabetic,[3] who has been afflicted with diabetes since he was five years old. During the past year, while he has been incarcerated at Green Haven, the plaintiff's health has steadily deteriorated. In February 1979, as a result of a gangrene infection, the plaintiff was transferred temporarily to Westchester Medical Center, where the small toe of his foot was amputated. A month later, he was sent back to the Medical Center, where his left leg was amputated from below the knee. Medical testimony indicated that these amputations were necessitated by the presence in the plaintiff's leg of "diabetic gangrene," a condition whose cause is presently unknown and which can be expected progressively to worsen regardless of any efforts, including rigid diet controls, taken to combat it.

Because "he is an amputee and can't get around on the block, and also to maintain a close watch on his diabetic condition," [4] Johnson is now confined in the hospital wing of the prison. He lives in a small room with a single bed that opens into a larger hospital ward. Both Johnson and his wife gave uncontradicted testimony that the physical structure of the hospital wing, and the general level of hygiene prevalent within it, are in deplorable condition. They testified that the entire hospital area is infested with cockroaches; that there are gaping holes in the ceiling, through which rainwater seeps; that the floor is strewn with pails used to collect the dripping water; that, for a time, there were no screens on the windows; and that exposed sewer pipes in the bathroom give off noxious odors.

But the essence of Johnson's complaint concerns neither the physical nor the general hygienic conditions at Green Haven— conditions apparently that the state has admittedly taken at least rudimentary steps

1. "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

2. The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted."

3. According to Dr. Marc S. Freedman, the medical director of Green Haven, "[t]he term 'brittle' means that even a mild stimulus, such as dietary indiscretion, changes in exercise activity and small amounts of insulin as little as two units, may all cause significant, even wide, fluctuations in blood glucose levels." Affidavit of Dr. Freedman, at 1. [Hereinafter cited as "Affidavit."]

4. Affidavit, *supra* note 3, at 1.

to alleviate.[5] Rather, his complaint concerns a particularized, individual grievance: that he has consistently been given food which, if eaten, would be injurious to his health; and that as a consequence, he is often forced to choose between endangering his health by eating the meals he is served, or foregoing part or all of those meals. According to his testimony, he has often chosen the latter option; between February and October, his weight dropped from 180 to 150 pounds.

It is not disputed that Johnson is keenly aware of what foods are appropriate for a diabetic, and that throughout his life he has very scrupulously attempted to eat properly and to avoid what he termed "dangerous" foods. According to him, a diabetic should consume between 1,800 and 2,000 calories per day; his meals should consist primarily of protein and vegetables, particularly leafy green vegetables; and to the extent possible, he should avoid eating foods containing starch and carbohydrates.

The meals he is served at Green Haven consist largely of starchy foods: "bread, potatoes, rice, beans [and] cake,"[6] items which it is suggested are "poison" to him. There are times when he can eat nothing on the food tray served to him. On these occasions, he sometimes is permitted to obtain milk, cheese, or dry cereal from the prison refrigerator. When those items are unavailable, he foregoes food entirely and instead merely takes insulin shots in order to maintain the level of sugar in his blood. Prison officials have never ordered special meals for him from outside the facility. Indeed, they have refused to permit John-

son's wife, who makes monthly visits to the facility, to deliver large packages of specially prepared food to her husband. Notwithstanding his repeated requests for appropriate food, and his wife's unsuccessful attempts to deliver such food, he claims that all of his appeals have been ignored.

The most important features of the plaintiff's testimony have been corroborated by Dr. Marc S. Freedman, the medical director of Green Haven, who has responsibility for the plaintiff's care and treatment. He testified that although medical research has not yet revealed any definite correlation between a patient's diet and the progress of the disease, and although Johnson's condition will continue to deteriorate regardless of his diet, it was his conviction that "without question" Johnson should be given a special diet appropriate for diabetics. Despite the fact that he ordered such a diet for the plaintiff, Dr. Freedman admitted that Johnson is not now receiving his dietary requirements: "Mr. Johnson has ordered for him a diabetic diet. Unfortunately, there is no dietician at Green Haven, and so the facility has little capability of creating and distributing true ADA [American Diabetic Association] diabetic (or any other special) diets. Even when an R.N. designs the diet properly, the trays come out wrong."[7] Despite Johnson's precarious medical condition, Dr. Freedman admitted that Johnson is "frequently" given food which, if eaten, "could be disastrous" to his health.[8] According to the doctor, "[p]roblems arise sometimes . . . where he may not eat at all because a tray comes to him with nothing that he deems he can eat

---

5. In his testimony to the Court, Mr. Johnson said that the hospital facilities at Green Haven had recently been moved to a different wing of the building. Although still "bad," the new facilities were said to be some improvement over the previous ones.

In addition, the state's representative, Mr. Herman, informed the Court that the state had issued contracts for work to improve the physical structure of Green Haven.

6. Affidavit, *supra* note 3, at 2.

7. *Id.* at 1. Dr. Freedman explained that prisoners at Green Haven are given food trays from one of two types of diets: the regular and the

special. Although the difference between the two is not clear, neither of the diets is designed to meet the needs of a diabetic patient. There is only one "special diet," which consists of a single tray of food uniformly given to all prisoners who, for any reason, are unable to eat the regular diet. Thus, the same food is served to inmates suffering from a variety of different maladies. Even for those to whom it is prescribed, the "special diet" is not always available.

8. Affidavit, *supra* note 3, at 2.

safely, or if he comes back from an outside clinic visit too late to get a tray." [9]  Additionally, while disclaiming any authority to order improvements in the physical condition of Green Haven, Dr. Freedman admitted that the facility's present condition is "undesirable."

The Court was informed, in response to its repeated inquiries, that the state maintains no penal institution in which an adequate diet, such as the one prescribed by Dr. Freedman, can be provided to an inmate.

### The Violation

The basic legal standard governing this case was first formulated in this Circuit.[10] It was later adopted by the Supreme Court in *Estelle v. Gamble*,[11] in which the Court held:

> [D]eliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," . . . proscribed by the Eighth Amendment.  This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.  Regardless of how evinced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.[12]

In *Estelle* the Court carved a middle road between two extremes.  On the one hand, it recognized that the state has a special duty "to care for the prisoner, who cannot, by reason of the deprivation of his liberty care for himself." [13]  The denial of medical care is forbidden because it subjects those who are vulnerable to gratuitous pain and suffering unrelated to any penological purposes.[14]  On the other hand, the Court was clearly reluctant to invade the province of medical wisdom by converting every case of medical malpractice into a constitutional tort.[15]  Thus, neither a "negligent diagnosi[s]" of a condition,[16] nor "an inadvertent failure" [17] to provide adequate medical care is deemed sufficient to create a cause of action under the Constitution.

Although a plaintiff must offer proof of more than mere negligence to prevail under the *Estelle* standard, the state's duty to safeguard the health of its prison population may be breached as readily by inertia as by action.  Moreover, in order to prove a constitutional violation, a prisoner may rely upon circumstantial evidence, from which "deliberate indifference" may be inferred.  As the Court of Appeals recently observed: "[W]hile a single instance of medical care denied or delayed, viewed in isolation, may appear to be the product of mere negligence, repeated examples of such treatment bespeak a deliberate indifference by prison authorities to the agony engendered by haphazard and ill-conceived procedures." [18]  In order to prove his case, the prisoner need only show that "the medical facilities were so wholly inadequate . . . that suffering would be inevitable." [19]

Upon the facts presented in this case, it cannot seriously be disputed that the actions of prison authorities "bespeak a deliberate indifference . . . to the ago-

9. *Id.*

10. *McCabe v. Nassau County Medical Center,* 453 F.2d 698, 704 (2d Cir. 1971); *Martinez v. Mancusi,* 443 F.2d 921, 924 (2d Cir. 1970), *cert. denied,* 401 U.S. 983 (1971); *Johnson v. Marton,* 55 F.R.D. 282 (S.D.N.Y.1972).

11. 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

12. *Id.* at 104–05, 97 S.Ct. at 291.

13. *Id.* at 104, 97 S.Ct. at 291.

14. *Id.* at 103, 97 S.Ct. 285.

15. *Id.* at 105, 97 S.Ct. 285.

16. *Id.* at 106, 97 S.Ct. 285.

17. *Id.* at 105, 97 S.Ct. 285.

18. *Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir. 1977).  *See also Bishop v. Stoneman,* 508 F.2d 1224, 1226 (2d Cir. 1974).

19. *Bishop v. Stoneman,* 508 F.2d 1224, 1226 (2d Cir. 1974).

ny"[20] of this plaintiff, with the consequence that he has been subjected to cruel and unusual punishment in violation of the Eighth Amendment. Even if the prison authorities had not been apprised of the gravity of Johnson's situation through his complaints, they surely were aware of his condition by February 1979, when they transferred him to Westchester for the first amputation. Indeed, Dr. Freedman has candidly admitted both that he knew Johnson's diet was inadequate, and that neither he nor anyone else at Green Haven took affirmative steps to insure that Johnson was fed food that would not be "disastrous" to his health if eaten. Moreover, the evidence dispels any suggestion that Johnson's plight arose from a single instance of negligence or ineptitude. Rather, Johnson is challenging a pattern of conduct, that seemingly amounts to a policy, whereby prison officials have consciously ignored the special dietary requirements of one diabetic inmate and have resolved, either consciously or through calculated indifference, to continue to ignore his special medical needs. These practices inevitably visit upon Mr. Johnson suffering that is beyond any legitimate purpose of his confinement. They force him into the draconian choice between jeopardizing his health by eating, or suffering, like Tantalus, the punishment of being shown food that he cannot eat. We hold that the Constitution does not permit prison officials to force that choice upon this prisoner.

During the argument of several motions and in the course of the hearing, the Court importuned the state's representative either to transfer the plaintiff to an institution in which his needs would be met or to provide for those needs forthwith at his present place of confinement. These requests were to no avail. In view of the state's indifference to the matter, the Court is required to take action. Thus, we turn to the question of relief.

### The Remedy

It has long been established that when district courts uncover constitutional violations, they have "broad discretion to frame equitable remedies so long as the relief granted is commensurate with the scope of the constitutional infraction."[21] Moreover, the violator's "[i]nadequate resources no longer can excuse the denial of constitutional rights."[22]

Most of the cases in which courts have rectified inadequate medical conditions have involved attempts by classes of inmates to achieve broad-scale institutional reforms.[23] Understandably the courts have voiced reluctance at becoming so deeply involved in the internal operation of penal facilities; however, that reluctance has not impeded them from approving far-reaching mandatory relief, where warranted. In *Todaro v. Ward*,[24] for example, the Second Circuit approved the district court's order directing a prison, inter alia, to provide all prisoners with better access to medical services, to upgrade laboratory work, and to institute recordkeeping procedures.[25] Before approving that relief, the *Todaro* court examined several factors, including: (a) the state of mind of prison officials, *i. e.,* whether they were actually aware of the existence of the violations; (b) whether the authorities had made any attempts to correct the situation; (c) the effect of the

---

**20.** *Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir. 1977).

**21.** *Id.* at 54 n. 7. *See also id.* (citing cases); *Newman v. State of Alabama,* 503 F.2d 1320, 1332–33 (5th Cir. 1974), *cert. denied,* 421 U.S. 948 (1975) ("[I]t is axiomatic that the remedial power of a district court is coterminous with the scope of the constitutional violation found to exist.")

**22.** *Todaro v. Ward,* 565 F.2d 48, 54 n. 8 (2d Cir. 1977).

**23.** *See, e. g., id.* at 52 n. 3 (citing cases).

**24.** 565 F.2d 48 (2d Cir. 1977).

**25.** *Todaro v. Ward,* 431 F.Supp. 1129 (S.D.N.Y. 1977), *aff'd,* 565 F.2d 48 (2d Cir. 1977). The Fifth Circuit went beyond even this in approving Judge Johnson's wholesale reorganization of prison medical services. *See Newman v. State of Alabama,* 503 F.2d 1320, 1325 (5th Cir. 1974), *cert. denied,* 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975).

**338**

relief on prison security and discipline; and (d) whether the Court would be required to assume a permanent role in administering the relief.

In addition to those factors, the Court here has considered the gravity of the injury, the necessity for prompt relief, and the availability of other remedies. After carefully weighing all of these factors, this Court concludes that injunctive relief would be particularly appropriate, if not compelled, in this case. The injury is grave and growing; time is of the essence; and quite obviously, the plaintiff is suffering irreparable harm. Despite their knowledge of Johnson's problem, prison officials have offered no hope that they will take corrective measures of any kind. Granting relief to a single individual, whose situation can be said to be almost unique, will neither undermine institutional discipline, nor thrust the Court into the thicket of prison administration. Nor will it burden the state with great expense.

Finally, there is clear precedent in this Circuit for the type of relief contemplated here. In the past, courts have been particularly responsive to prisoner's complaints about inadequate dietary conditions. In *Kahane v. Carlson,*[26] for example, the Second Circuit upheld a mandatory injunction requiring prison authorities to provide an Orthodox rabbi with meals "consistent with [his] religious scruples."[27] If the Constitution requires prison wardens to provide a religiously satisfying diet, it must also require one that is physically nourishing to an invalid, whose very life may hang in the balance.

In order to rectify the constitutional violations to which the Court finds Mr. Johnson has been subjected, and to protect him from further injury, it is hereby ordered that the state either: (a) transfer Mr. Johnson to a facility equipped to provide his physical and dietary needs; or (b) if such an institution is not available and he is kept at

Green Haven, insure that he is forthwith provided with fully adequate care, including a diet suitable to his special, individual needs.

The foregoing shall constitute the Court's findings of fact and conclusions of law.

Judgment may be entered accordingly.

---

26. 527 F.2d 492 (2d Cir. 1975).

27. *Id.* at 495. Other Circuits have been equally solicitous of the religiously-linked dietary pref-

erences of prison inmates. *See id.* (citing cases).