Carolyn LANGLEY, Alberta Succaw, Shirley Furtick and Celeste Cleckley, individually and on behalf of others similarly situated, Plaintiff–Class,

v.

Thomas COUGHLIN, III, Commissioner, New York State Department of Correctional Services, et al., in their individual and official capacities, Defendants.

Corean EVANS, Plaintiff,

v.

Thomas COUGHLIN, III, Commissioner, New York State Department of Correctional Services, et al., Defendants.

Nos. 84 CIV. 5431 (LBS), 83 CIV. 7172 (LBS).

United States District Court,
S.D. New York.

March 31, 1989.

Koob & Magoolaghan, New York City, for plaintiff-class; Joan Magoolaghan, Elizabeth L. Koob, of counsel.

Prisoners' Legal Services, New York City, for plaintiff–intervenor.

Robert Abrams, Atty. Gen. of the State of New York, New York City, for defendants except Klug; Judith A. Gordon, Stephen Mendelsohn, of counsel.

Singleton, Keegan & Spolzino, Mount Kisco, N.Y., for defendant Klug; Robert A. Spolzino, of counsel.

## OPINION

SAND, District Judge.

Defendant Klug, in his motion for summary judgment, and defendants Coughlin, Lord, and Duncan, in their collective motion for summary judgment, raise the defense of qualified immunity in response to plaintiffs' class action for damages, pursuant to 42 U.S.C. § 1983. Defendants' defense of

qualified immunity does not warrant the grant of summary judgment, and accordingly, defendants' motions are denied.

*Facts*

Plaintiffs in this class action are inmates at Bedford Hills Correctional Facility ("BHCF"), who were housed in Building 118 from 1981 through August 1987. In Building 118 (also known as "solitary" or "Special Housing Unit" ("SHU")), plaintiffs were locked in their cells up to 23 hours of each day, with one hour for recreation. Those plaintiffs suffering from chronic mental illness ("mentally disordered women") were allegedly kept in excessive isolation and denied adequate mental health care in violation of their rights under the Eighth and Fourteenth Amendments of the United States Constitution. The mentally disordered women are identifiable by their assaultive behavior and the marked deterioration they exhibited while in confinement. Those plaintiffs not suffering from chronic mental illness ("non-mentally disordered women") maintain that the conditions of their confinement subjected them to cruel and unusual punishment, in violation of the Eighth Amendment.

Throughout the relevant period, plaintiffs were subjected to noxious odors, noise, and danger as the mentally disordered women engaged in acts of self-destruction, arson, and assaultive behavior. Several mentally disordered women routinely spread feces and urine throughout the unit, flooded the unit with sewerage, and yelled and screamed day and night. Magoolaghan Affirm. (Dec. 10, 1988) ¶ 11. These occurrences were frequent, rather than merely an isolated incident, as indicated by approximately 400 entries in the Unusual Incident Reports for the period 1981–1987.[1]

Plaintiffs allege that all of the defendants were deliberately indifferent to their mental health needs. They maintain that defendant Klug, who was Unit Chief at BHCF until January 1987, is responsible for the inadequate provision of mental health evaluations, screening, procedures, and treatment. They allege that defendant Coughlin, as Commissioner of the New York State Department of Correctional Services ("DOCS") and in violation of his statutory mandate, failed to establish programs appropriate for the treatment of mentally ill inmates in need of psychiatric services. Plaintiffs assert that defendant Lord, who was Deputy Superintendent of Programs, responsible for designing and implementing inmate programs, and later Superintendent, responsible for the management of all security and administration functions within BHCF, should have developed programs to address the needs of the mentally disordered women, removed inappropriate inmates from Building 118, and arranged for the appropriate training of officers on the unit. According to plaintiffs, defendant Duncan, in his supervisory capacity as Discipline and Security Lieutenant and later as Captain in charge of uniformed personnel at SHU, also should have arranged for the training of officers on the unit, including instruction about when to refer an inmate to the New York State Office of Mental Health's ("OMH") Satellite Unit, which contains six dormitory beds, three observation cells and also provides outpatient services.

Defendants assert that they did not act with deliberate indifference, but took what actions they could given their limited au-

---

**1.** The following excerpt illustrates the type of incidents that occurred in Building 118 and were recorded in the Unusual Incident Reports:

8/9/86   Carolyn Langley threatened to cut herself with glass.

8/21/86   Faye Santiggo attempted suicide by inflicting lacerations on her right arm.

8/22/86   Deborah Williams was pounding on door with a hair brush. When COs [Correction Officers] entered they found two lighters and a watch. When CO tried to take one of the lighters, Deborah Williams punched them [sic] in the chest and then backed away.

8/26/86   Michelle Burris star[t]ed a fire.

8/31/86   Carolyn Langley had plastic bag tied over her head and fastened around her neck.

9/5/86   Faye Santiggo threw urine in CO's eyes.

9/7/86   Rhonda Walker started fire in cell.

Defendants' Exh. M at 14.

thority. Defendant Klug alleges that to the extent he personally treated the plaintiffs he did not depart from accepted medical practice, and to the extent that he did not personally treat them he cannot be held vicariously responsible under 42 U.S.C. § 1983. Defendant Klug's Memorandum of Law at 6–7. Defendants Coughlin, Lord, and Duncan claim no expertise in psychology that would enable them to treat plaintiffs and deny that they have the authority to obtain psychiatric treatment from OMH's Satellite Unit for the SHU inmates. They assert that the psychiatric needs of the plaintiffs are "beyond the control of the DOCS defendants" and that they "should not be held responsible for matters which are outside of their authority." Defendants' Memorandum of Law at 9.

### Discussion

■ In response to plaintiffs' allegations of constitutional violations, defendants have raised the defense of qualified immunity. This defense is available to government officials to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). However, the defense is available to government officials only "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* The statutory or constitutional rights must be clearly established in a "particularized" sense so that "[t]he contours of the right" are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3036, 97 L.Ed.2d 523 (1987).

The grant of qualified immunity, then, depends upon whether there was a clearly established constitutional right of which the defendants knew or should have known

at the time. To establish a violation of the Eighth Amendment, plaintiffs need to show that defendants' acts or omissions evidenced "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). Mere negligence or accident will not rise to the level of deliberate indifference; "[i]t is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." *Id.*

In this Circuit, the case law has helped to define the contours of prison inmates' constitutional right to medical treatment. The Second Circuit interpreted the deliberate indifference standard enunciated in *Estelle* to mean that "a constitutional claim is stated when prison officials intentionally deny access to medical care or interfere with prescribed treatment." *Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir.1977). In *Todaro*, the Court acknowledged that it is "well-settled in this circuit" that while a single example of medical care delayed or denied may be due to negligence, "repeated examples of such treatment bespeak a deliberate indifference by prison authorities to the agony engendered by haphazard and ill-conceived procedures." *Id; see Bishop v. Stoneman*, 508 F.2d 1224, 1226 (2d Cir. 1974). The Court in *Todaro* held that the medical practices and procedures at Bedford Hills were "constitutionally infirm" and that defendants could not avoid liability because they were either aware or should have been aware of conditions that "failed to meet even minimal standards." *Todaro, supra*, 565 F.2d at 53.

The finding in *Todaro* is applicable to the case now before us. Plaintiffs allege that defendants' practices and procedures in Building 118 constituted deliberate indifference, both to the mentally disordered women who were not receiving the treatment they needed and to the non-mentally disordered women who had to cope with the stress,[2] abuse, and unsanitary living condi-

---

**2.** Defendant Lord advised Deputy Commissioner Coombe, in a memo dated Dec. 31, 1985, that "[t]he impact on the other inmates and staff in SHU is dramatic and telling after a shouting

episode.... Certainly, the psychological stress for any person in that area of the facility could be measured if we tried." Plaintiffs' Exh. 26. Lord explained that the shouting was "stressful,"

tions caused by the mentally disordered women. The Court finds merit in the plaintiffs' claim of deliberate indifference.[3] At times, defendants and other officials have acknowledged the seriousness of the incidents, the frequency with which they occur, and the inadequacy of their practices and procedures to address them. *See, e.g.,* Plaintiffs' Exh. 21 (Mar. 17, 1983) (memo from Lord to Watterson); Plaintiffs' Exh. 27 (Mar. 24, 1983) (memo from Hernandez to Headley); Plaintiffs' Exh. 28 (Oct. 17, 1983) (memo from Lord to Broaddus).

Even if plaintiffs had been unable to establish deliberate indifference to their medical needs, which is not the case here, they would still be able to establish an Eighth Amendment violation by pointing to the conditions in which they are confined. In *Lareau v. Manson,* 651 F.2d 96 (2d Cir.1981), the Second Circuit continued to define the scope of the Eighth Amendment's protections. The Court held that the prison's practice of housing healthy or nondisruptive inmates with physically ill or psychiatrically ill inmates did not pass "constitutional muster." *Id.* at 108. Although this was a case of prison overcrowding, rather than of inadequate medical treatment, the situation described in *Lareau* is the same as the situation now before us, where mentally disordered women were confined with non-mentally disordered women.

In *Bishop, supra,* 508 F.2d at 1226, and *Todaro, supra,* 565 F.2d at 52, the Court looked to "a pattern of conduct" to find deliberate indifference, and in *Lareau,* the Court looked to "the totality of [the] circumstances" of the inmates' confinement to find a violation of their constitutional rights. 651 F.2d at 108; *see also Rhem v. Malcolm,* 371 F.Supp. 594, 610 (S.D.N.Y.) (inmates' rights measured against totality of circumstances in prison), *aff'd in relevant part,* 507 F.2d 333 (2d Cir.1974). Whether we look to defendants' pattern of conduct, including the systemic lack of access to and provision of mental health care, or to the totality of circumstances, including the noise [4] and squalor [5] in which plaintiffs were confined, we find that the record now before the Court sustains plaintiffs' claim that defendants have violated plaintiffs' Eighth Amendment rights,[6] which were clearly established at the time, and consequently, defendants are not entitled to summary judgment on their claim of qualified immunity.

■ Defendants Klug and Coughlin argue that in any event they cannot be liable under 42 U.S.C. § 1983 because they were not personally involved in the treatment that plaintiffs did or did not receive at BCHF.[7] Defendant Klug's Memorandum of Law at 6–7; Defendants' Memoran-

made inmates "anxious," and prevented them from sleeping. Plaintiffs' Exh. 17 (Lord Depos.) (Mar. 22, 1988) at 80–81.

3. The Court has been made aware of conditions in Building 118, not only from the detailed description contained in the parties' submissions, but also from the history of this case before the Court. In the course of the past five years, this Court has visited the site, held hearings, decided motions, and supervised a Consent Decree.

4. Defendant Lord wrote: "Frankly, I do not understand why the union does not argue that the noise [shouting, screaming] creates an unsafe working environment." She went so far as to recommend soundproof cells. Plaintiffs' Exh. 26 (Dec. 31, 1985) (Lord memo to Coombe).

5. An excerpt from the following memo gives a picture of the conditions in which SHU inmates' cells were found:

The cell Edwards moved out of was left with what appeared to be feces smeared on the walls and door inside and out. The cell was left filthy including the sink and tiolet [sic]. This cell was left with a lot of garbage inside including cups which had contained feces and/or urine. In the corridor, around the door and on the floor and walls, were garbage and food.

Plaintiffs' Exh. 30 (Oct. 21, 1985) (Smith memo to Negron).

6. The Court, having found a violation of plaintiffs' rights under the Eighth Amendment, need not reach the question of a violation of plaintiffs' rights under the Fourteenth Amendment.

7. The other defendants, Lord and Duncan, do not raise this argument, and accordingly, we do not consider it with respect to them.

dum of Law at 10. However, the Court finds that defendant Klug was personally involved in seeing inmates, supervising the Satellite Unit, and establishing the procedures to be followed. *See, e.g.,* Plaintiffs' Exh. 17 (Nov. 7, 1986) (Lord Depos.) at 63–64 (conversations with Klug about inmate's screaming and hallucinations); Defendants' Additional Exh. U1 (Oct. 8, 1985) (Rogers' memo to Klug referring to lack of alternatives for inmate "well known to us" for her "behavioral problems"). Although defendant Coughlin's involvement might have been less direct than that of the other defendants, he can still be liable as a supervisory official if:

> after learning of the violation through a report or appeal, [he] may have failed to remedy the wrong.... [H]e or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue.... [H]e or she was grossly negligent in managing subordinates who caused the unlawful condition or event....

*Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986). According to plaintiffs, there are several ways by which Coughlin would have become familiar with the plaintiffs' grievances, including complaints filed in 1983 and 1984 initiating this and a related lawsuit, and a 1987 report by the Correctional Association of New York, written in cooperation with DOCS, describing the deficiency in the treatment of chronically mentally ill inmates. Plaintiffs' Memorandum of Law at 13–16. However, even if defendant Coughlin remained uninformed, he was nonetheless charged by statute with the responsibility of developing appropriate treatment for inmates in need of psychiatric care. *See* N.Y. Correction Law § 401 (McKinney 1987). To the extent that he failed to develop and implement such programs or policies, or delegated that responsibility to others whom he then failed to supervise adequately, he remains personally liable according to *Williams.*

Defendants have brought motions for summary judgment, in which they have raised the defense of qualified immunity. We hold that summary judgment is not available to defendants because they knew or should have known that their acts or omissions violated plaintiffs' clearly established constitutional rights. Accordingly, defendants' motions for summary judgment are denied.

SO ORDERED.