**Joseph Allen ROSS, Plaintiff,**

**v.**

**Walter KELLY, et al., Defendants.**

**No. Civ. 84–1410L.**

United States District Court,
W.D. New York.

Feb. 5, 1992.

David L. Hoffberg, Rochester, N.Y., for plaintiff.

Carlos Rodriguez, Asst. Atty. Gen., Rochester, N.Y., for defendants.

## DECISION AND ORDER

LARIMER, District Judge.

## INTRODUCTION

This is a civil rights action brought pursuant to 42 U.S.C. § 1983 by a prison inmate in the custody of the New York State Department of Corrections (DOCS). The plaintiff, Joseph Allen Ross, claims that the numerous defendants—all present or former employees of the Department of Corrections—failed to attend to his medical needs. Specifically, plaintiff alleges that defendants demonstrated deliberate indifference to his serious medical needs in violation of the Eighth Amendment of the United States Constitution.

This action was originally brought by Ross, *pro se*. Prior to trial, the Court assigned David Hoffberg, Esq., of Nixon,

Hargrave, Devans & Doyle, Rochester, New York, to represent Ross.[1]

The matter was tried to the Court and the Court took testimony from plaintiff and approximately nineteen other witnesses. In addition, the parties submitted plaintiff's entire medical file and hundreds of other documents and reports—mostly from DOCS' files—concerning plaintiff and his medical care. This decision constitutes my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

This case is troubling in several respects. After a careful review of all of the evidence, it is apparent that there were lapses in the medical care given to plaintiff. Equally apparent, however, is the fact that plaintiff was examined and treated by numerous doctors employed by DOCS as well as by several consulting physicians at some of the best medical facilities in the state. There was to some degree a conflict among the physicians who examined plaintiff both as to the severity of his medical problems and as to the proper treatment for those problems. I am not able to say on this record that plaintiff received the best care under the circumstances. But whether plaintiff received the best possible care is not the ultimate issue here. This is not an action alleging malpractice or breach of contract to provide care. It is a civil rights case and plaintiff has the burden of convincing the Court by a preponderance of the evidence that the care and treatment he received while in the custody of the Department of Corrections was so bad that it constituted deliberate indifference to his serious medical needs in violation of the Eighth Amendment.

On this record, I do not find such gross conduct as to constitute deliberate indifference to Ross' medical needs. While his care and treatment may not have been the most ideal, it was certainly not of such a character as to rise to the level of a consti-

---

**1.** I would be remiss if I did not acknowledge the extraordinary effort put into this case by Mr. Hoffberg and his associate, Kevin Martin. The case was tried with dedication and vigor and I am sure that a substantial number of hours were spent on this case without any guarantee that a fee would be realized. In addition, I

expect that considerable costs were incurred for disbursements.

The willingness of these attorneys to undertake representation such as this on a *pro bono* basis is to be commended and is certainly in the finest tradition of the legal profession.

tutional violation. Therefore, plaintiff's complaint must be dismissed and judgment entered in favor of all defendants.

### FACTS

In early 1984, Ross was convicted of murder in the second degree for the killing of his wife. He was sentenced on March 23, 1984, to a term of imprisonment of twenty-five years to life. Ross was sent first to the Attica Correctional Facility in April 1984. Since that time, Ross has been transferred numerous times and has resided in approximately eight different state correctional facilities, some of them on more than one occasion.

Ross has complained of medical problems since he first entered the prison system and he continues to complain to this day. In his second Amended Complaint, plaintiff sued thirty-three state employees at various institutions where he had been incarcerated. Almost every superintendent, doctor or nurse that had contact with plaintiff throughout his prison stay was named as a defendant.

The Court granted summary judgment as to some of the named defendants and plaintiff dropped his claims against others as the case proceeded to trial.

Plaintiff's complaints related principally to his left knee and to both of his wrists. Just before he was arrested for murder in January 1983, plaintiff had undergone arthroscopic surgery on his left knee by a private surgeon at the Lennox Hill Hospital in New York City. He was advised by that doctor to do straight-leg raises and extensive walking as part of his rehabilitation program. Ross was on crutches and encountered some difficulty in his fourteen month period of pre-trial detention in New York. None of his present claims, however, relate to that period. Plaintiff's action involves only his treatment after he was sentenced in March 1984.

As to his left knee, plaintiff suffered from weakness and extensive pain. His condition was later diagnosed as "bilateral chondromalacia patella," which is a softening of the weight bearing cartilage in the knee. Damage to the cartilage caused pain when the knee was bent. Plaintiff also suffered from carpal tunnel syndrome principally in his right wrist.

It is the lack of treatment and care concerning these maladies that plaintiff claims constitutes a constitutional violation.

Ross was first committed to Attica from April 1984 to May 1985. During that stay he was treated by Dr. Frederick Downs, the Health Services Director at Attica. Downs, who is a named defendant, saw Ross on numerous occasions and provided treatment for Ross' leg problems. Ross testified at trial that his complaint against Downs was Downs' failure to order an orthopedic consultation and to see to it that Ross got proper exercise and medication. Apparently, Downs had advised Ross that he believed his problems related to degenerative arthritis. Downs and Ross were in conflict when Ross insisted that the doctor follow precisely the directions that Ross had received from his private physician who had performed the arthroscopy in January 1983.

Dr. Downs testified at trial that he received complaints from Ross concerning pain in his knees and lower back. Downs further testified that he prescribed medicine, exercise and leg braces. Downs recommended that Ross go for an outpatient consultation to the Erie County Medical Center, but, according to Downs, Ross refused. He also recommended that Ross receive an arthrogram but Ross refused that treatment as well. Ross' objection to these consultations was apparently based on his belief that his private physician had already done the necessary testing. Downs, on the other hand, believed that the prior physician's evaluation was outdated since it was made a year previously. Concerning stair-climbing, Downs recommended that Ross "limit" his stair-climbing.

Ross has also sued Attica Superintendent Walter R. Kelly and Richard Lester, the facility's Health Care Administrator. Ross' claim against these defendants is that they did not adequately respond to

Ross' complaints about what he perceived to be Dr. Downs' poor treatment.

Superintendent Kelly testified and denied that he had any independent recollection of Ross or his complaints. He would have routinely delegated prisoners' complaints to the responsible manager or supervisor. Since Kelly was not a physician, he relied on Downs' opinion because he was the facility's Health Services Director.

Richard Lester dealt with Ross when he complained, which occurred about seven or eight times during Ross' initial stay at Attica. He recalled that Ross was not satisfied with the leg braces that had been constructed and he returned both of them. Ross complained of delays in getting new orthopedic devices and Lester explained that such delay was an unfortunate part of prison life.

Ross had many complaints. He complained about delays in getting his leg braces and a neoprene sleeve that had been ordered. He complained because he was not provided with sand weights for his exercise program, but was instead required to use the free weights that were available to all the inmates. There were also about a dozen times during his stay at Attica when his medicine was not delivered promptly.

In May 1985, Ross was transferred to the Auburn Correctional Facility where he remained until November 1985. Near the end of his stay at Auburn, Ross obtained an outside orthopedic consultation with Dr. Brett Greenky at the Upstate Medical Center in Syracuse, New York. This referral was made on advice of Auburn's Medical Director, Dr. Ira Weiner.

Dr. Greenky diagnosed Ross' leg problem as bilateral chondromalacia patella. He recommended that Ross be immobilized for two weeks, that he perform approximately one thousand straight-leg raises per day and that he utilize a neoprene sleeve for his knees.

Ross' complaint at Auburn was that he never got the neoprene sleeve recommended by Dr. Greenky and that he was denied the use of weights to perform his exercises.

For a time, Dr. Weiner ordered Ross to be housed in the infirmary and provided him with a wheelchair because of Ross' leg pain. At this institution, Ross had a dispute with some nurses about receiving crutches. Apparently, at least some of his early requests for crutches were denied because his medical file had not yet been received from Attica.

Ross also complained about stair-climbing at Auburn, as he did at every facility. At Auburn, plaintiff was housed in the "flats," which was the bottom floor of the cell block, in order to reduce the number of stairs that he would have to climb. Ross was, however, not satisfied with this because he had to climb a few stairs to get to his cell.

Auburn Superintendent Robert Henderson is also named as a defendant, apparently for failing to respond adequately to plaintiff's complaints about lack of care. Henderson testified that he did receive complaints from Ross, but since they involved complaints about medical care, he referred them all to the medical staff. Henderson recalled consulting with the staff concerning Ross' medical care and was satisfied with their response. Basically, Henderson relied on the judgment of the medical staff concerning decisions about treatment for patients. In fact, Henderson wrote to Ross on July 1, 1985, and specifically told him that he would not substitute his judgment for that of the medical staff. (Ex. 24). He also responded to Ross' complaint that he had not received the orthopedic consultation that had been ordered by assuring Ross that he was on the list. He informed Ross that there was a lengthy waiting list for orthopedic consultations such as his. Henderson testified that because of the malpractice situation, he had encountered difficulty in getting local doctors in Auburn to see prison patients. As a result, he was required to send inmates to the Upstate Medical Center in Syracuse, New York, which resulted in considerable delay for cases that were not emergencies.

In November 1985, Ross was transferred to the Clinton Correctional Facility and remained there for only about two months.

Ross was treated at this facility by Dr. Donald Sheridan (who is not a defendant) and Robert W. Spence, the Health Services Administrator. At Clinton, Ross complained that Dr. Greenky's recommendations were not being followed principally because, according to Ross, he was not supposed to climb stairs and because he was denied proper weights to do his exercises. Dr. Sheridan did take Ross' neoprene sleeve to get it repaired but was late in returning it.

It was also during his stay at Clinton that Ross refused some treatment recommended by the staff. On December 17, 1985, Ross refused to go for an orthopedic consultation in Glens Falls, New York. (Ex. 54). Ross declined because he believed that he had already been evaluated sufficiently. In addition, about a week later, Ross refused to be hospitalized for his knee pain because he believed it was preferable to keep walking. (Ex. 57).

In January 1986, plaintiff was transferred to the Great Meadow Correctional Facility where he remained for six months. During his stay there, Ross was examined by four separate physicians. Dr. Joseph H. Foote was the Health Services Director at Great Meadow. When plaintiff first arrived at the facility, Foote directed that plaintiff be seen by Dr. Quellman, a board certified orthopedic surgeon. Quellman recommended physical therapy for Ross' leg. Ross received some outpatient physical therapy from Nancy Siegel, a physical therapist. Ross went to the therapy sessions but claimed that they actually aggravated his injury.

Because Ross continued to complain, Dr. Foote ordered another consultation with a physical therapist, Dr. David G. Welch. Dr. Welch wrote a detailed report concerning Ross to Dr. Foote on February 24, 1986. (Ex. 86). Welch described Ross as having some "early" chondromalacia of the patella. He believed that plaintiff had muscle weaknesses and problems with his gait which should require "only minimal physical therapy." Welch recommended that Ross walk up a slope and "take the stairs" down. (Ex. 86). Welch did not approve Ross' request to use 35–40 pound weights. Instead, he thought that 10 pound weights were sufficient. His conclusion was that Ross should show "improvement over time" and that he would not be left "with any significant disability" as a result of his knee problem. (Ex. 86).

On April 2, 1986, Dr. Foote wrote a detailed report to the facility's Superintendent, Everett Jones, concerning Ross' care. (Ex. 100). Foote minimized Ross' ailments. He concluded that Ross had some problems but believed that he should have no lasting disability. Foote pointed out that Ross often refused to follow the recommended care if Ross happened to disagree with the nature of that treatment or care. "This man does not agree with therapy recommendations or with our consulting orthopedic physician." (Ex. 100). He also thought that Ross was exaggerating his problems and he believed that Ross moved around the facility better than he claimed.

Plaintiff received another consultive examination while at Great Meadow. He was seen by Dr. Robert G. Sellig, who made no major recommendations. Dr. Sellig did not believe that Ross needed special shoes or the use of a cane. He also did not recommend heat treatments, but he did believe that some exercising of the quadriceps was beneficial. (Ex. 104). Concerning stair climbing, Sellig noted that patients with knee pain are advised not to do "extensive" stair climbing. In sum, his diagnosis did not reflect any grave problems with Ross.

Plaintiff was next transferred to Green Haven Correctional Facility from July 1986 to March 1987. Plaintiff has no claims against any state employees at this facility.

During his stay at Green Haven, plaintiff was seen by Dr. Conrad A. Kanaar, a board certified rehabilitation specialist. Dr. Kanaar found "minimal evidence of chondromalacia." (Ex. 129). His diagnosis was "incoordination of muscle function at the knee associated with long use of knee supports and a cane." (Ex. 129). He advised Ross not to use the leg brace but to continue with his exercise program. He made no written recommendation concerning stairs.

Dr. Kanaar saw Ross two months later and recommended that he abandon his cane and knee support. Ross had some restrictions on his activity, but Kanaar allowed him to stand, bend, push, pull and lift up to 30 pounds. (Ex. 130).

On March 10, 1987, Ross was moved back to the Attica Correctional Facility. During his four month stay, Ross received an orthopedic consultation with a Dr. Bouillon, a board certified orthopedic surgeon. This doctor recommended a new leg brace for Ross and advised plaintiff to avoid stairs. (Ex. 158). At this facility, plaintiff was not required to climb stairs to reach his cell, except that he did receive a pass for the law library which required some stair-climbing.

At trial, Ross claimed that he had the same complaints about personnel at Attica on this visit as he did when he was first assigned there in 1984. He claimed that he did not receive consistent physical therapy, that there were interruptions in his medicine, and that he did not receive a proper leg brace.

In July 1987, Ross was transferred from Attica to the Clinton Correctional Facility. Dr. Sheridan continued to be the Health Director there and plaintiff had no complaints against him. Robert Spence, the facility's Health Services Administrator is, however, a named defendant. Spence reviewed the entire record and determined that "occasional" stair climbing was permissible. He dismissed many of plaintiff's complaints as being without foundation.

During his stay at Clinton, Ross was examined by two orthopedic surgeons and he received special x-rays. In September 1987, he was taken to the Albany Medical Center and MRI x-rays were performed on his knees. These showed a tear in the medial meniscus and some slight knee joint effusion. (Ex. 176). X-rays were also taken of his wrist and they showed that he had carpal tunnel syndrome. A type of cock-up splint was recommended. (Ex. 177). Steps were taken at the institution in November 1987 to obtain better boots for Ross and to obtain an appropriate splint for his right wrist. (Ex. 187).

During the fall of 1987, Ross complained of being handcuffed when he was transferred outside the prison for these consultations. Ross claimed that the cuffing caused pain. On occasion at Clinton and at other institutions, Ross refused to go for treatment because he would be handcuffed. On November 19, 1987, Dr. Sheridan wrote a memo to those responsible for security that Ross should not be handcuffed on his right wrist because of pain. (Ex. 192).

In late November and early December 1987, Ross was seen by two other consulting physicians. He was first seen by a Dr. Stapor at the Albany Medical Center at the request of Dr. Sheridan. Stapor did not recommend any surgery but recommended vigorous quadriceps exercises and "no stairs." (Ex. 193). Ross fixed on Stapor's "no stairs" recommendation and wrote to Thomas A. Coughlin, Commissioner of the Department of Corrections, concerning this issue. (Ex. 194).

On December 8, 1987, Ross was seen by another board certified orthopedic surgeon. Dr. Sahail Khuir examined Ross and found both knees to be "quite benign." (Ex. 205). He found no effusion or tenderness and he determined that Ross had full flexion and good hip movement. His diagnosis was "mild" bilateral patella chondromalacia with left quadriceps atrophy. Dr. Khuir prescribed an exercise program for strengthening the quadriceps. He recommended exercises with weights "as feasible." He determined that repeated kneeling and bending was not advisable but he made no specific recommendations concerning stair-climbing. (Ex. 205).

At that point, Dr. Sheridan recommended that Ross be transferred to a facility where he would not have to climb stairs. (Ex. 207). Sheridan also requested a further consultation concerning Ross' wrist problems and Ross had a consultation with Dr. Jerome A. Davis, in Plattsburgh, New York. Davis recommended surgery to correct the carpal tunnel syndrome. He noted in his report, however, that Ross "wants to think about [having surgery] and will let us know." (Ex. 214). Unfortunately, within a day or two of Dr. Davis' examination, Ross

was transferred from Clinton to the Sullivan Correctional Facility.

Although Ross was housed on the first floor at Sullivan, he still complained because he had to climb ten steps to his cell area.

During this time, there were occasions noted in the record when Ross refused recommended treatment. On March 7, 1988, Ross refused to go for a psychiatric consultation. (Ex. 217). On another occasion, Ross refused to be treated at the Sullivan Infirmary because he believed that patients with AIDS were also being treated there. (Ex. 223).

On April 13, 1988, Ross was transferred again, this time back to Green Haven Correctional Facility. He was only there for two months but during that time he did consult with another orthopedic surgeon, Dr. Louis Nunez. In June 1988, Dr. Nunez wanted to perform arthroscopic surgery to remove cartilage from Ross' knee. Ross initially agreed to that procedure, but a day or two later, he withdrew his consent, "pending the checking of Dr. Nunez' credentials." (Ex. 231).

While at Green Haven, Ross was housed in the hospital dorm and was not required to climb stairs.

On June 24, 1988, Ross was transferred back to the Auburn Correctional Facility. The Health Services Director at this facility was Dr. Roger Spier, a board certified surgeon with training in orthopedic surgery. Ross was not happy with Dr. Spier's evaluation and he wrote to complain about it to Superintendent Henderson and others.

Spier wrote directly to Ross on July 6, 1988, and advised Ross that he had reviewed his entire file and had personally examined him as well. In Spier's view, "your situation in the facility at the present time presents no danger to your health." (Ex. 242). Spier advised Ross that he had scheduled him for a consultation at both the orthopedic clinic and the hand clinic at the Upstate Medical Center in Syracuse.

The matter of stair-climbing was a constant issue for Ross. On July 20, 1988, Dr. Spier put a memo in Ross' file stating that Ross was capable of walking up a flight of stairs and that such exercise would be beneficial for him. (Ex. 250).

While at Auburn, Ross was sent out of the facility for medical consultations with five different specialists concerning his leg and wrist. He saw Dr. Perry Shuman in late September 1988 concerning his wrist. Shuman recommended that Ross wear the cock-up splint full-time and that he not be handcuffed on the right wrist. Shuman gave Ross several splints but after a few months they wore out. Although Ross conceded that officials at Auburn attempted to get him a replacement, there was a substantial delay in getting a new splint.

Ross was also seen in November 1988 at the Upstate Medical Center by Dr. David Haas concerning his carpal tunnel syndrome. Haas' diagnosis was "mild to moderate right tunnel syndrome." (Ex. 284). Ross was seen again by Dr. Haas in May 1989 and Haas repeated his diagnosis of mild to moderate carpal tunnel syndrome. (Ex. 313).

In June 1989, Ross saw Dr. Shuman. Shuman discussed surgery with Ross and Ross indicated that he would "think about" the surgery. (Ex. 322). In August 1989, Ross was again treated by Dr. Shuman who recommended a carpal tunnel syndrome release operation on the right wrist. Shuman noted, however, that it would be preferable for the contemplated arthroscopic surgery on the knee to be completed first. (Ex. 334).

As for Ross' knee, Dr. Spier authorized a consultation at the Upstate Medical Center on September 30, 1988. Ross was treated there by Dr. Brett Greenky, an orthopedic surgeon who had seen Ross three years earlier when Ross was at Auburn. Greenky again diagnosed Ross as having bilateral chondromalacia. He recommended 500–1000 leg lifts per day and "limited stair climbing." (Ex. 270). He also prescribed a neoprene leg sleeve, which Ross claimed did not arrive for over two months. Dr. Spier also ordered daily showers for Ross due to his orthopedic condition. (Ex. 271). Deputy Superintendent of Security Frank Irvin originally authorized

showers every other day but this directive was overruled and in about three weeks Ross began receiving a daily shower.

On June 2, 1989, Ross was examined at the Upstate Medical Center by Dr. Richard G. Zogby, Chief Resident, Orthopedic Surgery. Zogby's original medical note indicated that Ross should "avoid stair-climbing." (Ex. 316). However, his full report to the medical personnel at Auburn a few days later minimized the stair-climbing problem. In that later report, Dr. Zogby recommended that Ross "climb stairs as he would normally during his routine activities of daily living. He should avoid more than 20 long descents each day." (Ex. 319). Zogby was also of the opinion that an arthroscopic examination was not warranted. His diagnosis was "mild changes of degenerative joint disease, bilaterally with some chondromalacia patellae possibly." (Ex. 319).

During Ross' stay at Auburn, there were numerous times when Ross refused medical appointments outside the facility. Some of Ross' refusals were related to his being handcuffed or shackled when he was transported. For example, when Ross was transported to see Dr. Shuman on May 22, 1989, his right hand was not cuffed but his left one was double cuffed and he wore leg irons. The next day, on May 23, 1989, Ross signed a form indicating that he would refuse all trips for treatment which required him to be cuffed and restrained by leg irons. (Ex. 314). There were numerous other documented instances when Ross refused to be transferred for medical consultation because of the use of leg irons. (Exs. 326, 332, 333).

Dr. Gregory Mathew, the Health Services Director at Auburn, wrote to Ross on June 26, 1989, and advised him that there were no medical orders in his file from a physician restricting the use of leg irons. (Ex. 327).

Frank Irvin, the Deputy Superintendent of Security at Auburn, testified at trial that he knew of no medical directive that precluded the use of leg irons until he received a letter from an Assistant Attorney General in March 1990. Virtually every prisoner that left the facility was shackled to prevent escape. Irvin testified that he had a special concern about Ross' danger of flight.

Ross also refused to go for treatment at the Hand Clinic, Upstate Medical Center, on both September 27, 1989, (Ex. 342) and October 25, 1989, (Ex. 350), because of certain "bogus" entries in his medical records. Apparently, these entries related to Dr. Zogby's report that Ross could climb stairs.

Upon application of plaintiff, this Court directed that Ross be examined by Dr. Martin W. Korn, an orthopedic surgeon in Rochester, New York, pursuant to Fed. R.Evid. 706. On December 22, 1989, Dr. Korn issued a detailed report. (Ex. 358). He recommended arthroscopy on both knees. If treated properly, it was his opinion that Ross' symptoms would resolve to allow weight bearing and stair-climbing. Pending surgery, he recommended and supplied neoprene knee sleeves and a TENS Unit to help reduce pain. He recommended against stair-climbing and shackling.

Concerning the wrist, Dr. Korn recommended that a neurologist examine Ross. Dr. Korn believed that Ross would probably require surgery for his carpal tunnel syndrome. Korn believed that the wrist ailments should be resolved prior to Ross' leg problems.

On January 11, 1990, Dr. Anthony Graceffo, the facility's Health Services Director at Auburn, was advised by a memorandum from a physical therapist that Ross had received the TENS unit recommended by Dr. Korn. (Ex. 363). Dr. Graceffo testified at trial that he probably knew that Ross had requested a TENS unit many months before Dr. Korn recommended it. Graceffo had used the device himself but he did not believe that it was appropriate for Ross' problems with his wrist and leg. Graceffo testified that when he received Dr. Korn's report he took steps to implement it to the extent possible, including use of the TENS unit.

Dr. Graceffo advised Ross in a memorandum dated January 25, 1990, that he had

reviewed Dr. Korn's report and that Ross would soon have another evaluation for arthroscopy. (Ex. 365). A consultation was arranged with Dr. Robert Lockwood at the Upstate Medical Center for this evaluation, but Ross again refused to go for treatment. Although Ross knew that this consultation related to Dr. Korn's report, he refused treatment on January 29, 1990, because of Dr. Zogby's "bogus" report of June 5, 1989. He also objected because he was not awakened early enough and could not get ready for the trip in twenty minutes. (Ex. 366).

Dr. Graceffo testified that Dr. Zogby's report caused considerable turmoil because rather than prohibiting stair climbing, he recommended that stair climbing was permissible as long as it did not exceed twenty steps.

Eventually, Ross did see Dr. Lockwood in March 1990. (Ex. 371). Dr. Graceffo interpreted Lockwood's report as requiring a neurological exam and a rheumatology consultation before arthroscopy. Ross was transferred from Auburn on March 15, 1990, before these procedures could be arranged.

Ross was sent to the Sullivan Correctional Facility. Dr. Guy Tufau was the Health Services Director at Sullivan during Ross' stay. Tufau was aware of Dr. Korn's report and he attempted to comply with its suggestions. He considered the report "a court order."

As to the arthroscopy, Ross was sent to the Helen Hayes Hospital for a consultation. On June 22, 1990, Dr. Peter McCann issued a report recommending therapy and the strengthening of the quadriceps, but he did *not* recommend arthroscopy. (Ex. 389). In addition, McCann indicated that there was no medical reason for not handcuffing Ross.

Dr. Tufau testified that because McCann had not recommended arthroscopy, he did not consider the procedure for Ross while Ross was at Sullivan, despite Dr. Korn's recommendation.

Dr. McCann also wrote to the nurse administrator at Sullivan on August 20, 1990, concerning Ross' stair-climbing ability. In McCann's opinion, Ross was "physically able to climb steps and in particular able to climb 10–12 steps of normal height." (Ex. 408). Based on his examination, McCann expressed "surprise" that Ross would experience so much pain in his knees that he would be unable to climb one flight of stairs. (Ex. 408).

Furthermore, Dr. Tufau testified that there were conflicting reports concerning the advisability of surgery for Ross' carpal tunnel syndrome. One doctor at the Helen Hayes clinic recommended it but another did not. Ross was examined by a neurologist, Dr. Gupta, at the request of Dr. Tufau on May 15, 1990. Contrary to earlier reports, Dr. Gupta found no evidence of carpal tunnel syndrome and no evidence of ulnar nerve compression. He concluded his report by noting that Ross' wrists were essentially normal. (Ex. 381).

Dr. Tufau testified that based on these conflicting reports, he determined to treat Ross conservatively after September 1990 to see how his wrist problems developed.

## DISCUSSION

The Eighth Amendment, by its terms, prohibits the infliction of "cruel and unusual punishment." To establish an Eighth Amendment violation based on the alleged inadequacy of prison medical treatment or the withholding of essential health care, plaintiff must prove that the defendants' actions or omissions amounted to "deliberate indifference to a serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). Recently, the Supreme Court held that the deliberate indifference standard includes both an objective and a subjective component. *See Wilson v. Seiter*, —— U.S. ——, 111 S.Ct. 2321, 2324–25, 115 L.Ed.2d 271 (1991). As to the former—the objective component, a court must ask whether there has been a sufficiently serious deprivation of the prisoner's constitutional rights. With respect to the latter, a court must consider whether the deprivation was brought about by the defendants in wanton disregard of those rights. *Id.*

To establish deliberate indifference, therefore, plaintiff must prove that the defendants had a culpable state of mind and intended wantonly to inflict pain. *See Wilson,* 111 S.Ct. at 2324–25; *Steading v. Thompson,* 941 F.2d 498, 500 (7th Cir. 1991); *DesRosiers v. Moran,* 949 F.2d 15, 19 (1st Cir.1991).

In my view, analysis of whether prison officials and medical personnel acted with "deliberate indifference" to plaintiff's "medical needs" must begin with *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). In *Estelle,* the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Id.* at 104, 97 S.Ct. at 291. The Court cautioned, however, that mere negligence is *not* actionable. "A [prisoner's] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." 429 U.S. at 106, 97 S.Ct. at 292. Rather, the plaintiff must allege conduct that is "repugnant to the conscience of mankind" or "incompatible with the evolving standards of decency that mark the progress of a maturing society." *Id.* at 102, 105–06, 97 S.Ct. at 290, 291–92.

*Estelle* is strikingly similar to the case at bar. There, the Court found that the plaintiff's claims against a prison physician were not cognizable under § 1983. Plaintiff in that case was seen by medical personnel on 17 occasions spanning a several-month period. The doctors diagnosed his injury as a lower back strain and treated it with bed rest, muscle relaxants and pain relievers. *Id.* 429 U.S. at 107, 97 S.Ct. at 292. Plaintiff contended that more should have been done by way of diagnosis and treatment, and suggested a number of options that the doctors failed to pursue. *Id.*

The Court rejected plaintiff's claims of a constitutional deprivation, concluding instead that "the question whether an X-ray—or additional diagnostic techniques or forms of treatment—is indicated is a classic example of a matter for medical judgment." *Id.* According to the Supreme Court, a medical decision not to order an X-ray or additional treatment constitutes, at most, medical malpractice. *Id.*

## A. Quality of Treatment.

It is well established that allegations of malpractice do not raise issues of constitutional import. *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292 and n. 14; *Church v. Hegstrom,* 416 F.2d 449, 450–51 (2d Cir.1969) ("Mere negligence in giving or failing to supply medical treatment alone will not suffice.") It is equally well settled that mere disagreement with prison officials about what constitutes appropriate medical care does not state a cognizable claim under the Eighth Amendment. For example, in *United States ex rel. Hyde v. McGinnis,* 429 F.2d 864 (2d Cir.1970), the Second Circuit dismissed an inmate's complaint of Eighth Amendment violations because the entire basis of his claim was disagreement with the prison doctor's professional judgment.

Similarly, in *Massey v. Hutto,* 545 F.2d 45 (8th Cir.1976), an inmate alleged that his right hand was disabled, that he suffered from skin cancer and that he had poor balance as a result of brain surgery. In rejecting the prisoner's Eighth Amendment claim, the court held that his medical records revealed that he was seen by prison medical authorities on 24 occasions, that his hand had been x-rayed and found fit and that he had received treatment for his skin lesions. "To the extent that he is not receiving the treatment he desires, his complaint reflects a mere disagreement over proper medical care." *Id.* at 46; *see also Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir.1977).

Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Thomas v. Pate,* 493 F.2d 151, 157 (7th Cir.1974), *cert. denied,* 423 U.S. 877, 96 S.Ct. 149, 46 L.Ed.2d 110 (1975). Moreover, courts have repeatedly held that a

prisoner does not have the right to the treatment of *his* choice. *See Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986); *see also Jackson v. Fair,* 846 F.2d 811, 817–18 (1st Cir.1988) (no claim of deliberate indifference to serious medical needs when prisoner transferred from high security psychiatric hospital to general prison population of another institution, because treatment at new facility was adequate and prisoner does not have right to treatment of his choice).

 Nor can the same standards of medical care be imposed upon a prison as are presumed to be realized at a hospital. In *Dean,* for example, the Second Circuit stated that a "correctional facility is not a health spa, but a prison in which convicted felons are incarcerated." 804 F.2d at 215; *see also Ruiz v. Estelle,* 679 F.2d 1115, 1149 (5th Cir.) ("The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves."), *vacated in part as moot,* 688 F.2d 266 (5th Cir.1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983).

 In my view, many, if not all, of plaintiff's claims amount to a mere disagreement with prison medical personnel concerning the appropriate course of treatment and level of care that he should receive. Plaintiff often disagreed with medical and supervisory officials regarding the nature of his care. From the day he was first incarcerated, plaintiff has sought to substitute his own judgment for that of the prisons' medical staff. An inmate's disagreement with the choice of treatment does not constitute a constitutional violation. Inmates have no "right" to dictate the type of procedure that must be utilized in a particular instance. Therefore, plaintiff's personal opinion concerning the nature and quality of care is of little value in determining whether there has been a constitutional violation concerning his medical care.

Although there were some instances where medical recommendations were not immediately followed by prison officials, for the most part medical decisions were carried out by prison officials consistent with the needs of the institution, including the legitimate security concerns relating to an inmate, such as Ross, who had been convicted of murder.

The real difficulty concerning Ross was not in implementing a medical plan, but in determining the precise nature and severity of his problem.

Plaintiff's treating and examining physicians have been far from unanimous in their diagnoses and recommendations for a proper course of treatment. Indeed, there is much conflict in the record concerning both the severity of plaintiff's medical problem and the treatment or therapy he should receive. For example, plaintiff contends that his doctors have recommended that he never use stairs. Although some doctors have stated that plaintiff should not walk up and down stairs, others have not issued such a flat prohibition, and some have even *recommended* that he use the stairs as a form of exercise.

The stair-climbing matter is but one example of disagreement among Ross' doctors. There was disagreement concerning the severity of his knee problem, whether it would be permanent, and whether arthroscopy should be performed. There was also some conflict as to the nature and extent of physical therapy needed by Ross to ameliorate the condition. Similar disagreement existed concerning treatment for his wrist problems.

This conflict was apparent at trial. Dr. Austin R. Levy testified as an expert for defendants, he reviewed Ross' medical records and examined him on December 6, 1990. In sum, he did not find Ross' condition to be very serious. Specifically, he believed that Ross' medical condition was stable, that no treatment including arthroscopy was needed, that Ross could climb stairs and that use of the TENS unit was not indicated.

Levy believed that Ross' chondromalacia was of a very low grade. Moreover, he did not believe that there was any need for a specific treatment concerning the carpal tunnel syndrome because Ross was not us-

ing his hand and wrist in a job where repetitious hand motions were required.

Although Levy's examination of Ross and his testimony occurred subsequent to December 1990, his findings underscore the conflict that existed in the medical community concerning Ross' condition. This division of medical opinion concerning Ross certainly suggests that no constitutional violation occurred because one course of treatment (preferred by Ross) was not followed. Dr. Korn also testified at trial and gave conflicting testimony.

At trial, Dr. Korn testified that in his opinion Ross should be operated on soon to correct the carpal tunnel syndrome in his wrist. He believed that an arthroscopic examination was appropriate concerning Ross' knees in order to aid in the diagnosis and treatment. Concerning stairs, he believed that they should be avoided if possible. He disagreed with Dr. Zogby's reports concerning stair climbing, and he did not recommend walking as a therapy for Ross' leg problems.

In short, many of the medical opinions relating to Ross were modified or challenged by different physicians, some of them from the most prestigious medical facilities in the state. When there is conflicting medical evidence as to the severity of an inmate's condition, "[c]ourts will not attempt to second-guess licensed physicians as to the propriety of a particular course of medical treatment for a given prisoner-patient." *Thomas v. Pate*, 493 F.2d at 158.

It is also hard to fault civilian prison personnel when the medical experts differed on the nature of care required. It is understandable and appropriate that civilian prison supervisory personnel would defer to the medical opinions of the prison doctors and other consulting physicians regarding the severity of plaintiff's condition and the proper course of treatment. *See McEachern v. Civiletti*, 502 F.Supp. 532, 534 (N.D.Ill.1980) (prison administrators "must necessarily place their confidence in the reports of the prison doctors whenever an inmate disputes a medical opinion as to what treatment is necessary and proper.")

In fact, most facilities have attempted to accommodate Ross' needs. Most facilities directed that plaintiff be housed on the first floor of a cell block to minimize stair-climbing. Some attempted to accommodate Ross by placing him in the infirmary or providing him with a wheelchair. In any event, it is clear after considering all of the medical evidence that *excessive* stair-climbing should have been avoided but that occasional, moderate stair-climbing was not harmful.

Furthermore, I find no credible evidence that prison personnel deliberately ignored the serious medical needs of Ross or intentionally interfered with his medical treatment. In fact, because of the conflicting medical opinions and probably because of Ross' complaints, Ross was seen not only by prison medical personnel but also by numerous outside consultants. I find no deliberate indifference to Ross' care but rather an attempt to ascertain Ross' problems and to determine the appropriate treatment. There certainly was delay, lack of communication and other problems associated with making a final diagnosis of Ross' problem, all of which were regrettable and should be corrected, but in light of the circumstances of this case, I do not find that either singly or considered as a whole these matters resulted in such a deprivation of care as to constitute a constitutional violation.

B. Delay in the Delivery of Medical Care.

Plaintiff next complains that "serious delays occurred in virtually every aspect of his medical care," which, according to Ross, evidences defendants' deliberate indifference to his medical needs.

While it is undeniable that delays did occur in Ross' treatment, I do not believe that the prison staff purposely caused the delays or intentionally ignored his medical condition. Likewise, I do not find that defendants deprived Ross of needed care in any constitutionally significant sense, or displayed an intention to punish him by withholding or intentionally delaying treatment. In fact, Ross himself is largely to blame for many of the delays in

treatment. The testimony demonstrates rather conclusively that Ross often second-guessed and disagreed with his treating and examining physicians concerning what his appropriate care should be. He even refused treatment altogether on a number of occasions, either because he wanted to check the doctor's credentials more thoroughly, because he believed that another course of treatment was warranted or because he "changed his mind" about the procedure. Given Ross' constant declinations to be treated by prison doctors and some outside specialists alike, any failure to treat his knee and wrist ailments was at best malpractice which, under *Estelle*, does not rise to the level of deliberate indifference. *See Jones v. Smith*, 784 F.2d 149, 151–52 (2d Cir.1986).

To be sure, deliberate indifference may be shown where prison officials erect arbitrary and burdensome procedures that "result in interminable delays and outright denials of medical care to suffering inmates." *Todaro v. Ward*, 565 F.2d 48, 53 (2d Cir.1977). In *Todaro*, the Second Circuit found the administration of medical services at Bedford Hills Correctional Facility for women to be inadequate. The Court noted that "essential medical services were denied, or unreasonably delayed and inmates forced to suffer needless pain." 565 F.2d at 50.

The Court of Appeals also noted that the district court in *Todaro* correctly rejected many of the plaintiffs' claims of inadequate medical care, "drawing distinctions between those practices which, while perhaps undesirable, do not amount to constitutional violations, and those that do." *Id.* at 53. Specifically, the district court had determined that the plaintiffs "failed to prove deficiencies rising to constitutional dimensions in the (1) *delayed administration of health examinations upon admission to the institution;* (2) delayed reporting of diagnostic test results; (3) treatment of the chronically ill; (4) assignment of medically unapproved duties; and (5) *access to outside specialists and elective surgery.*" *Id.* (emphasis added).

Although more attentive care might have been preferable, the actions of the defendants here can scarcely be said to offend accepted standards of decency, indicate obduracy or amount to the wanton infliction of unnecessary pain. In short, plaintiff has failed to show that defendants intentionally delayed needed medical treatment. *See Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir.1990) (finding that the failure of prison officials to provide a prisoner's medical records to transferee prison, causing confiscation of prisoner's sling, further injury, and delay in treatment did not rise to level of deliberate indifference); *Nolley v. County of Erie*, 776 F.Supp. 715, 740 (W.D.N.Y.1991) (Curtin, J.) (finding that late delivery or non-delivery of AZT to HIV infected inmate, while deplorable, did not amount to deliberate indifference because there was a lack of evidence that defendants possessed the culpable state of mind necessary for an Eighth Amendment violation).

C. Frequent Transfers.

Plaintiff also contends that the frequency with which he was transferred effectively denied him access to medical care.

The number of transfers in this case is troubling, but it is quite clear that inmates are routinely transferred throughout the system. An inmate has no right to remain in a specific institution. *See Meachum v. Fano*, 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976). In *Meachum*, 427 U.S. at 225, 96 S.Ct. at 2538, the Supreme Court stated:

> [T]he Due Process Clause [does not] in and of itself protect a duly convicted prisoner against transfer from one institution to another within the state prison system. Confinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose. That life in one prison is much more disagreeable than in another does not in and of itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe

rules.... Transfers between institutions, for example, are made for a variety of reasons and often involve no more than informed predictions as to what would best serve institutional security or the safety and welfare of the inmate.

Indeed, some of the transfers were made in an attempt to move Ross to a facility that could better deal with his medical problems. It is true that the transfers often necessitated repetition of some testing, but it also had the effect of causing Ross to be seen by numerous orthopedic surgeons and other doctors throughout the state. To be sure, it would have been preferable if Ross' medical problems could have been finally identified and treated while at one institution so that both Ross and prison officials could resolve his medical problems. It seems apparent, however, that both the nature and extent of Ross' problems as well as the needed treatment were a matter of dispute, which could not be resolved in a short period of time. I do not believe that the evidence established that the transfers were made for an improper purpose. "[T]he record does not support a finding that transfer decisions have been made in bad faith, out of pique, or on irrational grounds." *Cruz v. Ward*, 558 F.2d 658, 662 (2d Cir.1977), *cert. denied*, 434 U.S. 1018, 98 S.Ct. 740, 54 L.Ed.2d 765 (1978).

Plaintiff would impute to defendants an improper motive because of the frequency with which he was transferred. In particular, Ross claims that defendants violated the Department of Correction's "Policy, Procedures and Guidelines Manual" ("PPGM") on several occasions when they transferred him. I find this argument to be without merit.

The PPGM states that "[e]ach inmate awaiting priority admission to or follow up care at an outside health care provider or awaiting a therapeutic device for which fitting is required will appear on the [medical hold] list, as well as any other inmates whose health interests would not be served through transfer." (Ex. 421). Plaintiff claims that inmates awaiting follow-up care should be placed on the list.

In my view, ample evidence supports a finding that the PPGM did not apply here to preclude Ross' transfers. On a number of occasions, plaintiff himself requested that he be transferred. On others, Ross refused surgical procedures that were recommended. For example, in a February 22, 1988 letter to Dr. Donald Sheridan at Clinton Correctional Facility, Dr. Jerome Davis stated that he suggested surgery on plaintiff's right wrist but that plaintiff wanted "to think about it and will let us know." (Ex. 214).

Similarly, in June 1988, Dr. Louis Nunez wanted to perform arthroscopic surgery on plaintiff's knee. Plaintiff initially agreed but then withdrew his consent in a signed and notarized "withdrawal of surgical consent" statement. The form stated that "I am withdrawing surgical consent pending the checking of Dr. Nunez's credentials.... Furthermore I do not consent to any medical hold regarding my being kept in this facility." (Ex. 231). In the latter situation, plaintiff expressly rejected a medical hold. In addition, the record does not indicate that surgery or follow-up procedures were scheduled in either of these cases where he declined recommended treatment.

More importantly, even assuming the applicability of the PPGM in this case, "[n]ot every breach of prison regulations will give rise to an Eighth Amendment claim. What counts is whether the official conduct of which the plaintiff complains was in derogation of the constitutionally mandated 'deliberate indifference' standard." [2] *Des-Rosiers*, 949 F.2d at 21; *see also McGill v. Duckworth*, 944 F.2d 344, 350 (7th Cir. 1991) (guard's breach of prison's rules not equivalent to Eighth Amendment violation); *Amsden v. Moran*, 904 F.2d 748, 757 (1st Cir.1990) (a state actor does not violate the substantive component of the due process clause merely by violating a state law or

---

**2.** Of course, this is not to say that a breach of prison regulations can never be relevant to an Eighth Amendment claim. In some cases such a violation might be relevant to a prison official's intent. *See DesRosiers*, 949 F.2d at 21 n. 6.

regulation), *cert. denied,* —— U.S. ——, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991). On the facts of this case, I find that the transfers were not made in an effort to punish or intentionally deprive plaintiff of medical treatment. The care given plaintiff exceeded the constitutional minimum required by the Eighth Amendment.

## CONCLUSION

Based on all the evidence, I find in favor of all defendants on all of plaintiff's claims, and I further determine and direct that plaintiff's complaint be and hereby is dismissed.[3]

IT IS SO ORDERED.

---

**3.** Although I find no constitutional violation, it would seem that after seven years, the medical personnel at DOCS and plaintiff could reach some consensus on the appropriate treatment procedure. In my view, it makes little sense—absent some compelling penalogical reason—to transfer Ross until his medical problems are identified and a proper course of treatment finalized.

There must be some finality. Both prison officials and Ross must deal with this sensibly. Ross must understand that he is in prison and is not a patient at an exclusive health facility where he can pick and choose the physicians that he will see in all of the circumstances of his care.

Ross is not a physician and although he ultimately has the right to consent or not to the recommended procedures, there is a limit to the number of alternatives that prison authorities must provide to Ross.

Although it may be difficult to achieve in a prison setting, a spirit of cooperation should exist between the patient and those entrusted with his medical care. Prison officials must be sensitive to an inmate's medical needs but the inmate must also realize that he does not have unfettered discretion to pick and choose the treatment that he thinks is best and then seek court intervention because his personal wishes are not followed.