**Debra BRACEWELL, Plaintiff,**

v.

**Shirlie LOBMILLER, et al., Defendants.**

**Civil Action No. 90–C–851–N.**

United States District Court,
M.D. Alabama,
Northern Division.

June 26, 1996.

---

**4.** *See* H.R.Rep. No. 906, 98th Cong., 2d Sess. 3 (1984) (Criminal Fine Enforcement Act of 1984),

U.S.Code Cong. & Admin.News 1984, p. 5433.

Richard S. Jaffe, Stephen Andrew Strickland, Jaffe, Burton & DiGiorgio, Birmingham, AL, Marion F. Walker, Marion F. Walker & Associates, Birmingham, AL, Robert E. Toone, Southern Center for Human Rights, Atlanta, GA, for Debra Bracewell.

Nancy Ortega, Southern Prisoners Defense Committee, Atlanta, GA, Richard S. Jaffe, Stephen Andrew Strickland, Jaffe, Burton & DiGiorgio, Birmingham, AL, Robert E. Toone, Southern Center for Human Rights, Atlanta, GA, for Angela Allen, Gloria Richardson, Vivian Frankie Conwell, Lisa Taylor, Felicia Bowers, Sheila Turner, Tamika Cole, Patricia Stovall, Juana Tillman.

Angela Kaye Talley, Wetumpka, AL, Pro Se.

Richard S. Jaffe, Stephen Andrew Strickland, Jaffe, Burton & DiGiorgio, Birmingham, AL, for Angela Kaye Talley.

Fred Frank Bell, Office of the Attorney General, Montgomery, AL, Ellen Ruth Leonard, Alice Ann Byrne, Alabama Department of Corrections, Legal Division, Montgomery, AL, David E. Belser, Charles A. Graddick, G. Dennis Nabors, Graddick, Belser & Nabors, P.C., Montgomery, AL, for Shirlie Lobmiller, Dr. Thompson.

Ellen Ruth Leonard, Alice Ann Byrne, Alabama Department of Corrections, Legal

Division, Montgomery, AL, David E. Belser, Charles A. Graddick, G. Dennis Nabors, Graddick, Belser & Nabors, P.C., Montgomery, AL, for Ray Russell.

David B. Byrne, Jr., Robert F. Northcutt, Robison & Belser, P.A., Montgomery, AL, Billington M. Garrett, Office of the Attorney General, Montgomery, AL, Ellen Ruth Leonard, Alice Ann Byrne, Alabama Department of Corrections, Legal Division, Montgomery, AL, Charles A. Graddick, Graddick, Belser & Nabors, P.C., Montgomery, AL, for Dr. Gilbert.

Robert F. Northcutt, Robison & Belser, P.A., Montgomery, AL, Billington M. Garrett, Fred Frank Bell, Office of the Attorney General, Montgomery, AL, Ellen Ruth Leonard, Alice Ann Byrne, Alabama Department of Corrections, Legal Division, Montgomery, AL, for Sandra Walker.

## MEMORANDUM OPINION

CARROLL, United States Magistrate Judge.

### INTRODUCTION AND PROCEDURAL HISTORY

On August 14, 1990, the plaintiff, Debra Bracewell, an inmate at the Julia Tutwiler Prison for Women (Tutwiler), filed this action under 42 U.S.C. Section 1983 and the Eighth Amendment to the United States Constitution, against Shirlie Lobmiller, the warden at Tutwiler; Ray Russell, the then assistant warden at Tutwiler; and Dr. Helen Thompson, the then staff psychologist at Tutwiler. All were Department of Corrections personnel at the time the lawsuit was filed and all were sued in their official capacities.[1]

In her *pro se* complaint, Bracewell alleged that she was subjected to cruel and unusual punishment because she was housed in a segregation unit with mentally disturbed inmates. An evidentiary hearing was held on February 4, 1991, at Tutwiler, during which evidence was presented regarding the conditions of confinement of the segregation unit at Tutwiler. On February 14, 1991, the court appointed an attorney to represent Bracewell. A non-jury trial was held on December 10, 1991, during which further evidence regarding the conditions of the segregation unit was developed. On April 22, 1992, the court certified Bracewell's cause as a class action. The class consists of all inmates confined in the segregation unit of Tutwiler, including those who will be confined there in the future. In 1993, Tutwiler inmates Angela Talley and Betty Wilson filed separate *pro se* complaints against defendants Lobmiller and Thompson, and added correctional officer Sandra Walker and Dr. Jerrold Gilbert, a Ph.D. psychologist at Tutwiler who is also employed by Correctional Medical Services (CMS), as defendants.[2] Talley asks for $20,000 in punitive damages due to the mental harm she suffered as a result of being confined in the segregation unit with Debra Daniels, a fellow inmate. The Talley and Bracewell lawsuits have been consolidated, and Wilson dismissed her claim.[3]

At the court's insistence, the parties attempted to reach a settlement in the case following the 1991 hearing. Despite significant effort on both sides, no agreement could be finalized. On May 11, 1994, the court determined that, because of the passage of time since the first trial, additional evidence was needed before a ruling could be made. On August 17, 1995, a non-jury trial was held to determine the current conditions in the segregation unit and whether those conditions were constitutional violations.

### FACTS

The segregation unit (segregation) at Tutwiler consists of seventeen single cell iso-

1. None of the defendants are currently employees at Tutwiler.

2. Officer Walker has been dismissed as a defendant.
   Although Dr. Gilbert is still a defendant in this case, very little evidence, and even less relevant evidence, was presented about him. Because of the disposition of this case, the court does not focus much of its discussion on Dr. Gilbert.

CMS presently has a contract with the Department of Corrections for the delivery of medical and mental health services to the Department at the correctional institutions throughout the state.

3. The court will enter judgment in *Bracewell v. Lobmiller* only. The court will file a recommendation in *Talley v. Lobmiller*, 93–D–1051–N.

lation units, some 6′ × 8′ and others 5′ × 10′. The cells form an "L" shape, with units 1–5 on one hall and units 6–17 on the other. (dft. exh. 61) Inmates are housed in these units for various reasons. Some inmates are awaiting disciplinary hearings or serving segregation time imposed as a result of such hearings. Other inmates are in a status labeled administrative segregation which would include inmates in close and maximum custody who are behavior problems and inmates who are in protective custody or safekeeping because they are vulnerable to injury at the hands of other inmates. Inmates serving sentences of life without the possibility of parole are also housed in the segregation unit for an initial 90–day evaluation period.[4] There is also one death row cell in the segregation unit.[5]

Debra Bracewell testified at the December 10, 1991, trial regarding the conditions in the segregation unit at that time. Due to an escape, Bracewell had been in close custody status since March, 1990, during which time she was housed in the segregation unit.[6] She testified that she was able to go outside, alone, once per day for one hour; shower every other day; read a book or listen to the radio; and go to the law library. She was not able to have visitors in her cell or to visit anyone. Bracewell described a typical daily routine: breakfast would be served at 4:30 a.m., at which time she would wake up, eat, and then go back to sleep until 8:00 a.m., when she would have to get up to clean her cell and get dressed. Bracewell then testified that she would either go back to sleep, read, write letters, or listen to the radio until 9:30 a.m. when lunch was served. She had the same choices until 2:30 p.m. when the evening meal was served, and again until 10:00 p.m. when the lights were turned off. Every other day she showered at some point between 12:00 a.m. and 1:00 a.m.

Bracewell testified that there is one officer assigned to the segregation unit per shift, and there are three shifts per day. If the officer needs back up (for example, during shower time, exercise time, or if an inmate is acting up), another officer will enter the segregation unit.

Bracewell also testified as to the general noise level in segregation. She stated that she could hear the inmate in the cell next to her even if that person were speaking in normal tones. She could not hear an inmate two or three cells away who was speaking in normal tones, but could hear such an inmate if she were talking loudly enough. Typically inmates hollered to carry on conversations with one another. Other noises come from toilets flushing loudly and officers talking to or hollering at inmates.

According to Bracewell, these conditions changed in July, 1990 when Debra Daniels and Charlene Wade, two inmates, entered the segregation units. These inmates screamed and hollered 24 hours per day, shouting to officers and other inmates; they cussed; they beat on their beds; they threw cups, glasses, urine, and feces into the halls; and they spit on her. In addition, inmate Twyla Hurst beat on the walls, talked to herself very loudly, and played with herself. Further, in April, 1991, another inmate who exhibited similar behavior was placed in segregation—Glenn Pugh. Also, another inmate, Lolita Bull, made a lot of noise screaming and hollering and threatening to kill herself, and she threw things out of her cell when she got mad. Yet another inmate, Laverne Wallace, would talk to herself, cuss herself out, and then act like she was talking to somebody else.[7] Bracewell testified that these inmates wreaked continual havoc in segregation. For example, Daniels would wait for inmates to pass her cell on the way to the shower, and throw feces at them. Bracewell testified that it smelled so bad that it "made you sick." The officers would clean the feces or have Daniels clean it. If Daniels refused to clean it, she would be

---

4. These inmates are required to remain in a single cell for 90 days.

5. The death row cell is unit 1.

6. Bracewell was in disciplinary segregation for about 30 days during this time. As a result, for those 30 days she was still within the segregation unit, but she had no privileges.

7. Inmates Pugh, Wallace, Hurst, and Bull were no longer in segregation at the time of this hearing.

handcuffed to her bed. Bracewell stated that Daniels would beat the cuffs on her metal bed until they were taken off of her. Daniels also was handcuffed to the cell bars on occasion, and she would beat the cuffs on the bars of the cell.

Bracewell testified that the conditions were so bad in segregation that she "couldn't think straight. It was so bad I couldn't read a book, I couldn't concentrate. I would be upset a lots, I would cry a lots. I would get to the point where I wanted to kill myself just to get out of it.... almost every time the noise got loud, every single time." Bracewell even asked the inmate beside her for her medication; she saved quite a few pills, but never took them. She did not take showers so that she did not have to walk past their units.[8]

By August 14, 1995, the date of the final trial in this case, Bracewell had left the segregation unit. So had all of the other inmates whom Bracewell named as problems, except for Debra Daniels. Daniels was still causing problems in the unit, and many people testified as to the conditions in segregation with Daniels as a resident.

The first person to testify about conditions in segregation at Tutwiler in 1995 was Patricia Ann Gregg, an inmate who did not live in segregation, but who worked in segregation from approximately mid February, 1995 through mid May, 1995, seven days per week, two to three hours per day. She attested to Daniels' outbursts, but stated that when it came to the overall noise level, Daniels was not louder than anyone else. She also stated that on May 14, 1995, she handed Daniels a broom to clean her cell, and Daniels used it to masturbate. When Gregg retrieved the broom, Daniels spit in her face. A little while later, Daniels began throwing feces and urine in the hallway and into another inmate's cell. Daniels also cussed her out. Gregg testified that she had difficulty sleeping that night due to Daniels' behavior because she did not want to return to the

segregation unit. She also felt mad and degraded. This was the first incident involving Daniels that Gregg reported, it was the first incident involving Daniels that really offended her, and it was the first time that Daniels was disruptive to this degree. When she was paged the next day for work in the segregation unit, Gregg refused, and she was not disciplined or required to return to the segregation unit for work.

Inmate Michelle McCamy was the next to testify. She stated that she was in segregation from July 12, 1995 through August 3, 1995 for disciplinary reasons, and she rotated through many different cells. McCamy described a sixteen hour period when she and several other inmates were forced to stay in the same cell as Daniels.[9] She said that she was very uncomfortable when Daniels was in the cell. Daniels cursed at her, yelled at her, threatened to kill her, and even hit her. McCamy also stated that she was too scared to sleep while in the cell with Daniels. At one point, Daniels asked her to play cards with her, and McCamy complied. McCamy did not report Daniels' behavior to any prison officials.

She also testified that while in segregation, aside from this sixteen hour period when she was actually in the cell with Daniels, she heard Daniels cursing when she was on her hallway, and saw her throw liquids from her cell into the hallway, into the death row cell, and once onto a guard. Daniels would scream, sing, slam her bed around and hit the rails. This behavior occurred in the day or evening, but rarely when McCamy was trying to sleep.

The next inmate to testify was Monica Andrews. She was housed in the segregation unit from July 11, 1995 until August 1, 1995. She too was housed in a cell with Daniels and several other inmates for sixteen hours. Andrews said that this made her feel bad because Daniels is disgusting and threatens people. She also testified that, while

---

8. Bracewell's version of the conditions in the segregation unit is supported by log entries made by correctional officers during this period of time.

9. During a certain period of time, there were more inmates in segregation than there were cells. As a result, the inmates were forced to share a cell for sixteen hours at a time, and were then rotated to a single cell for eight hours to enable them to sleep.

alone in a single cell, Daniels beat on her grill and banged her bed day and night; she cussed, screamed, and sang loudly during the night so that it interfered with Andrews' sleep; this occurred on a daily basis, and Andrews could hear Daniels from any cell she was in. Also, Daniels threw liquids out of her cell—at least three times onto the death row cell alone—and threw feces from her cell two or three times, morning, evening, and night. In addition, Daniels wrote Andrew's name on her (Daniels') wall in feces one time. Andrews testified that when Daniels threw or smeared her feces, it made the entire segregation unit stink.

Inmate Lynda Lyon, who has been housed on death row in the segregation unit since December 21, 1994, testified next. Except for a few weeks time, Daniels was housed in the unit next to Lyon's unit. Lyon testified that Daniels was noisy on a daily basis, and would bang on her mesh door with her fists and feet, bang her bed against the wall, yell, scream, and cuss. She had outbursts of bad behavior at least three or four times per week which would last for up to two to three hours at a time. She usually did not do this at night because her medication put her to sleep. In addition, Daniels would "display her anatomy" to Lyon. Lyon also testified that Daniels threw feces into her unit on one occasion, and that it caused an odor. Around the same time, Daniels also threw feces out of her cell in the other direction. And, according to Lyon, Daniels threw feces again, as recently as one week before the hearing. Further, Daniels threw liquids out of her cell approximately six times. Daniels urinated in her toilet and threw the liquid at Lyon's cell two or three times. Daniels even hit Lyon down her front with the liquid. Lyon said this humiliated her, and that she had never been subjected to anything like it in her life. She said she could not eat, and just stayed in her room. She felt sub-human. Lyon also testified that she developed continuing headaches because of Daniels' behavior, and that she was put on two aspirin three times per day.

Inmate Talley, who has sued for $20,000 in punitive damages testified next. As a life without parole inmate, she was automatically placed in administrative segregation for three months when she entered prison—from February 3, 1993 until May 1, 1993. She testified that when she first arrived she was in unit seven, and she could hear Daniels in unit two or in unit fifteen. When she first arrived, Daniels shouted questions at her continuously until she finally answered. Quite often, especially after Daniels learned her name, Daniels kept her up at night by shaking her bars, banging, and yelling very loudly. She stated that Daniels hollered and screamed, especially during the night, and that she could not sleep through Daniels' outbursts. Talley told of several other inmates who complained of an inability to sleep due to Daniels. Daniels cursed at her just about daily and, when Talley was moved into a cell near her, Daniels would wake her up in the morning. In addition, Daniels threatened Talley's life.

Talley also recounted one incident when Daniels, who was in the cell next to her, threw a four to five inch tall, wet ball of feces into her cell. It went all over Talley. Talley also told of other instances when Daniels threw feces, and of the odor it caused.

The final inmate to testify as to the conditions in segregation was Corliss Maddox. She was in segregation from May, 1993 until September, 1993, due to disciplinary infractions. Maddox rotated among cells 3, 10, and 11, and could hear Daniels, who was in cell 2, from all three cells.[10] From the exercise yard, Maddox saw Daniels spit and eat toilet paper, and heard Daniels announce that she was going to drink urine and eat feces. Maddox stated that Daniels would beat, bang, and kick, and that she often could not sleep as a result of the noise. She told of an instance when Daniels threw feces at her cell, and another instance when Daniels wrote Maddox's name in feces on Daniels' cell. The latter episode made her sick to her stomach, and she would not eat breakfast. Maddox testified that Daniels threw feces

---

**10.** Cell 3 was right next to Daniels, but cells 10 and 11 were on the other side of the L shape from Daniels' cell.

approximately five times while she was back there, and threw liquid over ten times. Maddox could never eat when Daniels threw feces. Maddox also saw Daniels spit out of her grill, and throw dirty sanitary napkins about three times from her cell.

Maddox returned to segregation for disciplinary reasons for 45 days in the fall of 1994. During this time Daniels was constantly beating and banging in her cell, day and night, and she threw liquids about four times, but she did not throw feces or sanitary napkins during this time. Maddox could not sleep as a result of Daniels' behavior, and she went on medication to assist her in sleeping.

Maddox also spent time in segregation in 1995.[11] During this time, Daniels threw feces four or five times, at least, and threw liquids about six times. Daniels also continued with noise making—banging and beating—but mainly during the day time. As a result, Maddox was unable to rest during the day. Maddox also spent 16 hours in a cell with Daniels during the period of time when the segregation unit was overcrowded.

Several of the segregation unit officers testified by way of deposition as to the conditions in segregation. These officers worked for one shift—a total of eight hours—per day, and could only testify as to the conditions which they encountered on their shifts on the days that they worked. Officer Virginia Brown has worked in segregation on second shift—from 2:00 p.m. to 10 p.m.—since September, 1994. Her deposition was taken in June, 1995. She said that Daniels has acted out ten or more times since she's been working. Daniels would sing, yell, and beat on the grill of her cell, but only for thirty minutes, tops. Brown saw Daniels throw liquid, but not sanitary pads or feces, although she had heard recently of Daniels throwing feces out of her cell; Brown herself saw feces smeared on the walls of Daniels' cell. Brown testified that Daniels has gotten better over time. She also said that Daniels is no different than other inmates who have been in the segregation unit.

Officer Wanda McGhee has worked second shift in segregation permanently since 1993. Before that time, she worked in segregation if someone were absent, or on weekends. McGhee testified that in 1991, she saw Daniels talking loudly, cursing, attempting to spit on the officers, and throwing water; this all occurred at night. She did not see Daniels throw urine or feces. McGhee thinks that Daniels has gotten better since 1991 by not acting out as frequently, but also thinks that Daniels is no better or worse than any other inmate. McGhee said that she's given Daniels seven disciplinaries since 1991.

Officer Sally Russell also testified via deposition. She has worked third shift in the segregation unit since 1990. According to Russell, Daniels has threatened to kill people, but never threw anything out of her cell on Russell's shift. Daniels did have verbal outbursts while it was dark outside. Russell testified that when she first started working, she would begin work at 10:00 p.m., and Daniels could be hitting on the bars, singing out loud, and cursing; but, now she is not as disturbing as she used to be. In fact, according to Russell, Daniels has not behaved disruptively on her shift for years. Russell also testified at the 1995 hearing. She answered most of the questions by stating that she did not remember anything and by being evasive. Eventually she remembered some things. Because Russell was incredibly resistant to questioning, and evaded answering even the most straight forward questions, the court does not credit her testimony.

Indeed, the court finds it difficult to fully credit the testimony of officers Brown and McGhee because they indicated that Daniels is like any other prisoner. Based on the evidence as a whole in this case, that is simply not true.

The court also notes that, according to the Department of Corrections' records, Daniels has received over 100 disciplinaries from July 4, 1990 until May 26, 1995, and has spent and will spend years in segregation as a result.[12]

---

**11.** Although it is not clear from the record, it appears that Maddox was in segregation from January until June, and then from June until August, 1995, first for close custody and then for a disciplinary infraction.

**12.** According to various testimony throughout the trial, Daniels did *not* receive disciplinaries or

## DISCUSSION

■ The plaintiff class properly attacks the conditions in segregation under the eighth amendment. A valid Eighth Amendment claim of this kind has two components: (1) an objective component which requires that the conditions be "sufficiently serious." *Farmer v. Brennan,* 511 U.S. 825, ——, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994); *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991), and (2) a subjective component which requires that prison officials exhibit "deliberate indifference" to prisoner health or safety. *Farmer,* 511 U.S. at ——, 114 S.Ct. at 1977; *Wilson,* 501 U.S. at 301–305, 111 S.Ct. at 2325–28. Each of these components will be analyzed in light of the facts of this case.

### THE OBJECTIVE COMPONENT— CONDITIONS OF CONFINEMENT

In the recent words of the Eleventh Circuit summarizing the law in this area:

No static "test" can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." "The objective component of an Eighth Amendment claim is, therefore, contextual and responsive to contemporary standards of decency." Only a deprivation which denies "the minimum civilized measure of life's necessities" is grave enough to violate the eighth amendment. (Citations omitted)

*Jordan v. Doe,* 38 F.3d 1559, 1564 (11th Cir.1994).

■ The court has little trouble concluding that the conditions, both past and present, in the segregation unit at Julia Tutwiler Prison for Women are sufficiently serious to meet the objective component of the Eighth Amendment test due entirely to the presence of Deborah Daniels on that unit.[13] The evidence before the court shows that inmates who are confined in the segregation unit at Tutwiler are forced to endure Daniels' repeated and erratic outbursts of disruptive and disgusting behavior. These outbursts include yelling, screaming, hollering, banging, cursing, and the throwing of liquids, unclean sanitary napkins, and feces. These outbursts are Daniels' trademark and any inmate who is confined in segregation for whatever reason is punished by her behavior. Although the frequency of Daniels' outbursts has diminished in the recent past, they continue to render the conditions on the segregation unit at Tutwiler unconstitutional even today.[14]

write ups for every time she acted out. For example, defendant Russell testified in his June, 1991 deposition that Daniels set something on fire, "but there are no reports on it."

13. Obviously, if other inmates like Daniels were housed on the unit, conditions would be worse.

14. The following is a summary of entries from the Institutional Incident Report log during the period from September 10, 1992 through October 7, 1992. The first two did not occur within the segregation unit:

9/10/92: 3:23 a.m. Daniels and another inmate get into a fight and threaten each other.

9/12/92: 10:55 p.m. Daniels began talking loudly to no one in particular, and when told to stop, continued to rant and rave and act in a loud and belligerent manner.

9/14/92: 1:42 a.m. Daniels was masturbating with a mop handle in the shower area.

9/15/92: 11:35 p.m. Daniels sassed to an officer.

9/19/92: 8 a.m. Daniels threw feces covered tissue paper at an inmate. The inmate threatened to throw urine on Daniels. Daniels ripped two state gowns in half, both of which she had wiped feces on, and hung them on the bars of her cell as a shield.

10/2/92: 4:39 a.m. Daniels was making finger popping sounds. When told to stop she stated, "I don't need to stop nothing. I'll stop when I get god damn ready to, now call that in bitch." Daniels then began to knock on her bed, pop her finger, sing aloud, spelling loudly the letters L–U–C–I–F–E–R, and flush her commode continuously.

10/2/92: 10:45 p.m. Daniels was very loud. Daniels threw feces into another inmate's cell.

10/5/92: 12:43 p.m. Daniels was beating her head against the wall. She threatened to put her baby's life in jeopardy (she was pregnant at the time) if she were not let out of segregation.

10/7/92: 5:48 p.m. Daniels hollered at an officer, "you red head half white mother fucker, you don't know nothing," and continued to talk after being told to be quiet.

The disciplinary log provided to the court contains entries through May, 1995. Even this most recent month shows that Daniels incurred three disciplinaries for her behavior. In May, 1995, Daniels' behavior included spitting on an officer

The most toxic by-products of Daniels' tantrums are the noise, the sleep deprivation which the noise causes and the personal humiliation of being the target of her physical and verbal abuse. Inmates testified that often they were unable to sleep due to Daniels. Some have been forced to take medication to sleep or alleviate headaches. Others have been hit with feces or urine, and almost everyone who has been assigned to segregation has been forced to live in an environment permeated by the smell of human waste. The deprivations experienced by the inmates in segregation are not temporary inconveniences and discomforts but rather ongoing problems of a serious nature. The harmful effects of Daniels' behavior are exacerbated by its unpredictability. Guards and inmates alike testified that no one knows when she will act out or who will be her next target. Prison officials testified that they believe Daniels engages in her bizarre behavior in some sort of dark attempt at manipulation. Regardless of her motive, her effect on the inmates in segregation is harmful and injurious. The sleep deprivation and anxiety which her behavior causes certainly results in a deprivation of basic necessities which rises to the level of a constitutional violation. *See Keenan v. Hall*, 83 F.3d 1083 (9th Cir.1996) (Public conceptions of decency require that inmates be housed in an environment free from excessive noise); *Langley v. Coughlin*, 709 F.Supp. 482 (S.D.N.Y.1989) (Conditions in unit where plaintiffs were subject to noxious odors and noise and where women routinely spread feces and urine throughout the unit violated the eighth amendment); *Rhem v. Malcolm*, 371 F.Supp. 594, 627–28 (S.D.N.Y.1974) (conditions of confinement unconstitutional where inmates exposed to excessive levels of noise and the bizarre behavior of deranged inmates).

## SUBJECTIVE COMPONENT— DELIBERATE INDIFFERENCE

█ Having concluded that the conditions of confinement in the segregation unit are objectively serious enough to violate the Eighth Amendment, the court must now decide the second issue—*i.e.* whether prison officials were deliberately indifferent to those conditions. *See Wilson v. Seiter,* 501 U.S. at 302–03, 111 S.Ct. at 2326–27. As the Supreme Court has recently noted:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health and safety; the official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer v. Brennan,* 511 U.S. at ——, 114 S.Ct. at 1979. An official is deliberately indifferent "only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it." *Id.* at ——, 114 S.Ct. at 1983.

█ In a case such as this one where the plaintiffs are requesting injunctive relief for a contemporary constitutional violation of a nature likely to continue, they must show that "the defendant officials were at the time the suit was filed, and are at the time of [the opinion] knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so ... during the remainder of the litigation and into the future." *Id.* The court finds that, at the time the suit was filed, the defendants were deliberately indifferent to the unconstitutional conditions in the segregation unit. The court also concludes, albeit reluctantly, that the plaintiffs have failed to show, under the appropriate legal standard, that the deliberate indifference presently exists.[15]

### DECEMBER 1991

█ The evidence presented at the December hearing properly focused on the

---

and an inmate, masturbating with a broom, throwing feces out of her cell, smearing the words "pussy" and "fuck" on her wall with feces, throwing urine soaked tissue into another inmate's cell, kicking her cell door, and beating on her bed.

15. The court reaches this conclusion reluctantly because the defendants' actions, while not deliberately indifferent, have not totally solved the problem. The problem would clearly be solved if Daniels were housed somewhere else.

knowledge that the defendants had of the problems in the segregation unit. Based on the evidence before the court, it is clear that then Warden Lobmiller and then Deputy Warden Russell knew that the presence of Daniels and some other equally disruptive inmates was having a harmful effect on inmates on the segregation unit. Bracewell testified that she spoke or wrote to Warden Lobmiller, Officer Russell, and other DOC staff members about the circumstances in segregation. She was also depressed, and was seen by psychiatric staff members Drs. Thompson, Kutner, Hollifield, or McNeal, at least weekly.

Based on his observation of Bracewell and her conditions of confinement, Dr. Kutner concluded that the conditions in segregation were contributing to Bracewell's depression and affected her mental health. (1991, p. 209; tape deposition, p. 52, notes) Indeed, he wrote a letter on 1/24/91 to the court stating, "Due to the pervasive nature of Debra's personality disorder, to subject her to additional stressor such as long periods of isolation, in addition to housing her with seriously disturbed psychotic inmates definitely adversely affects her mental health and exacerbates her symptomatology." (Plf.Exh. 53) At the 1991 trial, Kutner stated that he spoke to Russell about Bracewell. (1991, p. 211) Russell admitted that he saw the letter and talked to Kutner about possibly changing Bracewell's custody status, which he stated was "impossible" to do. (1991 taped depo.; plf. exh. 10) In her taped deposition, Lobmiller stated that she was made aware of Dr. Kutner's letter after he wrote it. She also stated that she took no action in response to the letter.[16]

Warden Lobmiller also knew in other ways that Bracewell was having problems. When asked, "Were you aware that Debra, during this period, was upset emotionally, frustrated by the situation she found herself in, that is the segregation unit and the behaviors of these inmates," Lobmiller answered, "yes." (1991, pp. 241–242) Further, Lobmiller testified that Bracewell complained "directly" to her about the inmates who were causing her

problems, and that she and Russell talked about it periodically. (1991, p. 261) In her 1995 deposition, Lobmiller stated that "I can say that I continued to check on Debra and communicate with Debra Bracewell on a regular basis and to listen to whatever she had to say." (plf. exh. 148)

Dr. Thompson also knew of the conditions in which Bracewell was living, and the effects which they had on her. She testified that she visited the segregation unit twice per week. (1991, p. 150) She also stated that Bracewell complained about Daniels frequently. (plf. exh. 149, p. 55) She further testified that Bracewell's needs were closely monitored. (1991, p. 156) In her April, 1991 deposition, Thompson said that she's "observed that Debra tends to get depressed at times." (plf. exh. 14) In addition, as the evidence discussed below indicates, she talked with Bracewell or received letters from her concerning her conditions of confinement and the adverse effects they were having upon her. (*see infra*) Further, Lobmiller testified in her June, 1995 deposition that "I'm sure that I discussed with ... Dr. Thompson, as the departmental psychologist, the status and condition of [Bracewell and Daniels]." (plf. exh. 148)

The record is clear that all three defendants had knowledge that the conditions in segregation were causing a risk of serious emotional harm to Bracewell.

Despite the knowledge which they had, Lobmiller and Russell did nothing about the conditions. Instead, they made light of the problems. For example, in July, 1990, Bracewell wrote,

> the law book say I should not be housed with insane inmates or be mix with them. This is cruel and unusual punishment for me to be mix with insane inmates. They said *only* the *doctor* could say that a inmate is insane and I talk to *a doctor* and he said the *inmates* are *insane*. This is cruel and unusual punishment for me to be house with insane inmates.

(Plf.Exh. 18) In response, Russell stated, "Inmate Bracewell you are housed in a single

---

**16.** There is no date attached to this taped deposition, plf. exh. 10. Since the attorney for the plaintiffs is Ms. van Almen, it is apparent that the deposition was taken early on in the lawsuit.

cell, no other inmate is assigned to that cell and no other inmate has access to it. You are not 'housed' with anyone." The court is hard pressed to believe that Russell actually thought Bracewell meant she was actually in a cell with an insane inmate. The court finds that Russell understood Bracewell's complaint, but ignored it and failed to take action concerning it.

In another grievance filed by Bracewell around November, 1990, she writes, "Mr. Russell, It is real bad back here in the segregation unit. The inmates are screaming and hollering all day and night. It so bad back here and something need to be done. Please do something back here. Please. Please answer me back." In this case, Russell wrote back that he visited the segregation unit twice and there was no screaming or hollering going on. Since the evidence is clear that screaming and hollering did go on on a routine basis in segregation, the court finds that Russell's actions were inadequate to deal with the situation. If he had talked to any of the segregation duty officers or inmates in segregation, he would have known about the seriousness of the problem. Simply because there was no screaming and hollering in the segregation unit on the two occasions when he went back there does not mean that a problem did not exist. Given the circumstances as evidenced by the exhibits and testimony, Russell's response was unreasonable.

Even more telling of the defendants' attitudes is a 11/90 series of letters written between Warden Lobmiller and Debra Bracewell regarding pet therapy and a change in Bracewell's status, two events which could have eased the difficulty Bracewell faced in being exposed to the conditions of the segregation unit. Lobmiller wrote, "I find no reason to allow you to have a 'pet.'" I find no reason to release you from close custody. I find pity in my heart for you. Pity is not a part of my job responsibility. I act on rules and regulation of the Department of Corrections. Bracewell wrote back to Lobmiller explaining that "one reason you can let me out is because these inmates back

here that is not in their right mind scream and holler all day and night and also they use the bathroom and throw it outside their cell." The warden responded, "when you become warden, you can make the decisions you feel are best." Clearly, the warden's response, in the context of her knowledge of the problems that existed in the segregation unit, was unreasonable and disregarded the harm caused by the conditions in which Bracewell was living.

At one point, the warden did move Bracewell to a different cell to help alleviate the problems she was having with noise. Bracewell testified that the noise was not as loud, but it was not really better. (1991, pp. 77, 257) Also, Lobmiller eventually gave her a pet, even though regulations prohibited close custody inmates from having pets. (1991, p. 257) Further, measures were taken to curb the problem inmates' actions, such as putting mesh on their grills to prevent them from throwing things out of their cells and removing their mattresses during the day so that they could not sleep, and therefore would not be up all night. (1991, pp. 76–79) In addition, Bracewell was offered a two hour pass into general population during the night hours of third shift, but she refused the pass, choosing instead to sleep during those hours. (1991, p. 79) Finally, after asking for a job, Bracewell was offered a job she could do in her cell. She refused because remaining in her cell would not help her get relief from the segregation conditions. This really was not a solution for Bracewell. Given the severity of the problem as the defendants knew it, these steps were not reasonably calculated to abate the harm or risk of harm to Bracewell.

Bracewell also talked to Dr. Thompson and sent her notes about her circumstances. At one point, Dr. Thompson offered to put her in the green room.[17] Bracewell did not go because people housed in the green room cannot go outside; get ice, books, or law materials; or get credit for serving close custody time in segregation. In addition, mentally disturbed people are housed in the green room. Dr. Thompson also offered to

17. The green room is the mental health unit at Tutwiler. It is not within the segregation unit, but it consists of five single cell units, four of which are operable.

recommend to Warden Lobmiller that Bracewell take care of a pet for therapy. She had a bird for a few months, but gave it away back because "I felt like the noise was getting on the bird's nerves just as bad as it was getting on mine, and I wouldn't want a bird to go through what I was going through." She said that when the hollering would start up, the bird would holler too.

The record contains several letters written by Bracewell to Thompson regarding her circumstances in segregation, and/or wanting Thompson to come visit her. Sometimes Thompson did visit Bracewell. On the other hand, she took no steps to abate the conditions. In April, 1991, Bracewell wrote to Thompson,

> There is an inmate back here that is making alots of noises. In fact she is doing the same thing Debra Daniels and Charlene Wade did. She is throwing stuff out of the cell and beating on the bed and making alots of noises. She don't need to be back here. She need to be in the green room. Please do something with this inmate.

Thompson replied, "It is not up to you to diagnose mental illness. Whatever is determined to be the case will be handled by the appropriate authority."

In 8/91 Bracewell filled out a grievance form which reads,

> They put inmate Wallace on the same side of the segregation unit I am on. Wallace is in Cell #5. Wallace talk to herself and she have a mental problem. I cannot sleep because she is talking to herself. Segregation unit is not a mental ward. They have a mental ward in the H.C.U.

A level one shift commander responded, "I am 'they' and I ordered that the inmate in question be placed in Unit # 5 in order to be monitored closely. The noise level in the segregation unit has not caused anyone else to lose any sleep. I do not feel that you are qualified to diagnose another inmate's condition, nor are you in charge of inmate movement and placement." This response is typical of a failure to take action.[18]

18. Even though this response was not written by one of the defendants, it is typical of their atti-

The bottom line, at this period in time, was that the defendants knew of the risk of harm associated with the conditions in the segregation unit, and failed to take reasonable actions to prevent Bracewell from being subjected to this risk. This is deliberate indifference.

### AUGUST 1995

The evidence adduced at the evidentiary hearing in August 1995 was significantly different than that adduced at the hearing in 1991. The evidence presented at the hearing in 1995 unfortunately focused on the treatment or lack thereof afforded Deborah Daniels, rather than on the effects that her behavior had on other inmates in the segregation unit. While the court has concluded that the conditions in the segregation unit were severe enough to satisfy the objective component of the Eighth Amendment standard, it does not necessarily follow that the defendants then and now were deliberately indifferent to those conditions. Indeed, the court finds that the plaintiffs have failed to prove that the defendants were in 1995 or now deliberately indifferent to the conditions in the segregation unit. The court's conclusion has two bases—(1) that the plaintiff class has failed to prove that the defendants had *actual* knowledge that the conditions in the segregation unit, after the first hearing in this case, were so serious that they were injuring the members of the plaintiff class; and (2) that the defendants, particularly Warden Lobmiller and Dr. Thompson, took some steps to minimize Daniels' impact on the other inmates.

Pat Gregg testified that the only incident in segregation that offended her was when Daniels spit in her face. Gregg stated that she had trouble sleeping, thinking she would have to return to work. First, it is unclear as to whether any defendant knew of this incident. Even if any or all of them did, however, the steps taken to rectify the situation were reasonable. Gregg was allowed to wash her face immediately. Further, she was not made to return to the area around Daniels' unit that day. In addition, she did

tudes, and included as part of the record.

not have to return to her job in segregation, she was not disciplined for failing to return, and, to this day, she does not work in the segregation unit. Gregg's testimony fails to show deliberate indifference on the part of the defendants.

Michelle McCamy was in a cell with Daniels, during which time outrageous behavior occurred. Indeed, she was harassed, threatened, and actually punched by Daniels. This testimony focused primarily on Daniels' behavior and the conditions of confinement, and not on the defendants' alleged deliberate indifference. McCamy stated that she did not tell officials, guards, or the psychiatric staff about Daniels' effect on her.[19] And, she said that when Daniels threw urine and feces, workers were called to clean it up. Her testimony does not show deliberate indifference.

Dr. Conboy, the plaintiffs' expert focused his testimony on Daniels. He never visited the segregation unit to assess the conditions or the psychological impact of Daniels' behavior on other inmates. He never discussed Daniels with any of the persons housed in segregation. Consequently, he offered nothing to support the plaintiffs' claim of deliberate indifference.

Monica Andrews' testimony focused on the conditions element of this claim, but really did not reveal any information as to what the defendants knew about the plaintiffs' risk and how they acted or failed to act. Her testimony does not aid the court in determining whether the defendants were deliberately indifferent.

Lynda Lyon's testimony, on the other hand, did address the deliberate indifference issue. Lyon testified that she complained to Dr. Gilbert on a weekly basis about Daniels. She also testified that she told the warden what she was having to put up with.

Lyon testified that it took her a while to get used to Daniels' noise and antics because they were bad, and made her tense up, but that she had to get used to it, did get accustomed to it, and learned to tune Daniels out.[20] She testified that it wasn't until Daniels started throwing feces and urine that "it just did something to me." (1995, p. 374)

Lyon stated that when Daniels threw feces and urine on her it made her feel subhuman, like she rather be executed. She described the situation as it existed after Daniels threw feces on her, in May, 1995. The guards called for back up, which took about 20–30 minutes to arrive. For the first time, Lyon asked for Daniels to be moved. The guards locked the meal slot on Daniels' cell to prevent her from throwing feces and a notation was made to keep the slot locked.

In August, 1995, Daniels threw urine water at her. She told the officers about it, and she was made to clean her cell—since there was no back up available—while an orderly was sent to clean the area around her cell. She asked three officers—Drissel, McGhee, and Brown—to have Daniels moved.[21] Lyon became depressed for about three days, and kept her door shut. Her depression was reported to Walker who talked with Lyon about Daniels. According to Lyon, Walker became upset for Lyon. First she offered to move Lyon, and Lyon resisted because her death row cell, in which she is confined all day, is larger and more private than the other segregation cells. Within one hour, Daniels was moved to a segregation cell on the other end of the unit. Lyon said that her migraine headaches improved after Daniels was moved. This testimony shows the court that within one hour of Lyon showing signs that she was at risk within her conditions of confinement, her conditions were changed. The response to Lyon's situation was reasonable, and did not amount to deliberate indifference. Lyon became depressed, and within

---

19. At one point in her testimony McCamy said that she told a guard about Daniels' behavior toward her after she was removed from the same cell as Daniels. Since she contradicts this testimony immediately and gives an explanation as to why she did not tell a guard, the court credits her later, more lengthy and explanatory statement.

20. In an August, 1995 letter she wrote to Lobmiller, Lyon stated that "Deborah Daniels didn't bother me until she began throwing her bodily wastes at me. Once she was moved, I was fine again." (Dft.Exh. 86)

21. There is evidence that Officer Harper laughed about the situation.

three days she was removed from the conditions which were depressing her.

Talley testified that in 1993, the inmates, herself included, would complain at night when Daniels yelled, but that it did no good. This testimony demonstrates to the court that in 1993, the guards knew that the inmates in segregation were unable to sleep, and failed to take measures to correct this problem. Lyon's testimony reveals, however, that Daniels often sleeps at night now since she has been medicated, so there is no longer deliberate indifference.[22] Further, Talley stated that when Daniels threw feces on her and in her cell, she had to clean her cell, but she was taken on the exercise yard while Daniels cleaned the hall. Talley's testimony also shows that officials responded reasonably to Talley when Daniels threw feces on her. Talley indicated that she never spoke to the mental health personnel about her problems in segregation and that she never told them she was suffering in any way. This testimony fails to establish any current deliberate indifference on the part of the defendants.

Corliss Maddox's testimony reveals that she complained to Officers Lawrence, Brown, and McGhee about Daniels. There has been no showing that Maddox's complaints were actually relayed to the defendants and no showing that any of the defendants knew of her problem. The plaintiffs did not elicit testimony revealing that the defendants knew of a risk to Maddox and failed to abate it. At best, this testimony goes to the general knowledge of officials that Daniels was a problem in segregation.

Warden Lobmiller acknowledged that she knows of Daniels antics and knows that she is a problem. When asked whether Daniels was a problem for the other inmates in segregation she replied, "I would think she would be a problem for me, if I were housed back there." The court infers from this response that Lobmiller knows that Daniels is a problem for the other inmates in segrega-

tion. In addition, Lobmiller agreed that as long as Daniels is in segregation, any other inmate in segregation is going to be subjected to Daniels, whatever risks there are associated with being around her. Lobmiller also testified that she had numerous discussions with Dr. Thompson about the other inmates on segregation who are exposed to Daniels' behavior. When asked what she has done to alleviate the problem in segregation the warden answered that she changed the location of the cells, modified some cells by putting mesh on them, moved people from one cell area to another, and separated inmates who cause problems. She later stated that made these changes "in an effort to do everything possible to prevent Deborah from subjecting the other individuals to her behavior." (1995, p. 620)

Dr. Thompson knew of Daniels' behavior and reviewed the segregation unit. She testified that Daniels' behavior was "irritating" to the other inmates. She said that there was a "continuum of irritating. She can be quite irritating at times, quite annoying." Thompson testified that to prevent this irritation and annoyance, she worked with Daniels, would move her to the mental health cells for the weekend, took her to her office, brought a cat back to segregation for her, took her to the exercise yard, and tried methods of rewarding her for good behavior, all so that Daniels would not cause disruption to the segregation unit.

She also testified that many segregation inmates complained to her about Daniels. In response, she would try to arrange for the person to be moved away from Daniels; ask them if Daniels were getting on their nerves; ask them if they want to see a psychiatrist; ask them if they want to go to the mental health unit to get away for a while; or offer them as many options as possible. She stated that she asked Talley about herself, especially because she was right next door to Daniels. Talley answered that she was fine and never specifically never complained to

---

**22.** There has been some testimony to the effect that in 1995 there were inmates who were deprived of sleep because of Daniels. Since Lyon has been in a cell next to Daniels for 99% of the time since 12/94, the court credits her testimony

as opposed to that of other inmates who have not been in segregation with Daniels over such an extended period of time.

The court does not pass judgment on the propriety of medicating Daniels.

her about being in mental distress. She said that she did not know "of any who suffered, you know, any distress," and that once people were out of Daniels' proximity their irritation or headache would go away. (1995, p. 653)

Kimberly Stanley, a psychiatric nurse with CMS who works at Tutwiler five days per week for 10–11 hours per day testified that she made rounds in segregation three times per week and talked with the inmates.[23] According to her testimony, one inmate in segregation complained to her about Daniels' behavior, but no inmate complained to her on any of her rounds that they were suffering mentally or physically as a result of being on the segregation unit at the same time as Daniels. She testified that she was surprised that Lyon was having problems with Daniels because she spoke to Lyon frequently and Lyon never complained to her about Daniels, except to say that she believed Daniels was receiving special treatment.

Dr. Gail Williams was the last person to testify for the defendants at the August 1995 hearing. He is the Chief Psychiatrist and statewide mental health director under the contract that CMS has with the Alabama Department of Corrections, and has been to Tutwiler 19 times since November, 1994. He stated that Daniels has been a significant problem while at Tutwiler and that he has spoken with other inmates while visiting the segregation unit. When asked whether he had an opportunity to observe whether Daniels' behavior had any significant adverse effect on the other segregation inmates he responded, "I've made no such observation, nor have any inmates made that complaint to me." (1995, p. 748) Williams later stated that no segregation inmates expressed to him that they were suffering mentally or physically as a result of Daniels being in the segregation unit with them. Even later, however, he admitted that he has neither done anything to determine what, if any, ill effects are occurring to the inmates exposed directly to Daniels in the segregation unit nor has he spoke to the warden about this

issue. Indeed, Williams stated that he thinks it's a possibility that the segregation inmates bring Daniels' behavior onto themselves by taunting her.

Stanley and Williams' testimony supports the court's finding that the defendants lacked knowledge of a substantial risk of serious harm.[24] Any communication that these mental health professionals had with the defendants would have indicated that Daniels' presence was not harming other inmates.

As noted above, the court concludes that the problem with Daniels is so severe as to deprive inmates confined on the segregation unit of the "minimum civilized measure of life's necessities", thus satisfying the "objective" Eighth Amendment standard. This court reached that conclusion after a five day trial concentrating on the conditions in the unit. In deciding that the conditions were severe enough to violate the objective Eighth Amendment standard, the court relied not only on the evidence presented but on logical inferences from the evidence. In deciding whether the "subjective" or deliberate indifference test of the Eighth Amendment is satisfied, however, the court cannot, in making its decision, rely on inferences. The deliberate indifference calculus as outlined in *Farmer v. Brennan* requires proof of *actual* not inferential knowledge. In the words of the court, before a prison official can be found to be deliberately indifferent, the plaintiff must prove that the official was both "aware of facts from which the inference could be drawn that a substantial harm exists and that he or she drew the inference." *Farmer v. Brennan*, 511 U.S. at ——, 114 S.Ct. at 1979. In this case, the defendants arguably knew some of the same facts which the court has before it which would establish that Daniels' presence in the segregation unit caused a substantial harm to the inmates there. However, there is no evidence that the defendants made the same inference which the court has made about the conditions in segregation and the harm to the inmates. There is nothing in the record, for example, which indicates that any of the de-

---

23. CMS became the health care provider in November 1994.

24. In Lyon's case, there was such a risk, but there was no testimony that the defendants knew of it. Even if they did, however, reasonable measures were taken to abate the risk.

fendants were told by prison mental health professionals that housing Daniels in segregation harmed the other inmates. There is also no evidence directly relating anyone's mental illness to Daniels' presence in segregation. The defendants failure to reach the same conclusion as the court has reached about the conditions in segregation may be unfortunate but under the current state of the law, their failure does not constitute deliberate indifference.

## CONCLUSION

The conditions in the segregation unit at Tutwiler cause this court grave concern. The court will enter judgment for the defendants because the law requires it. This opinion should not be taken as an endorsement of the conditions in segregation or the defendants' conduct.

Judgment will be entered accordingly.